UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
AT ASHLAND
Civil Action No. 18-15-HRW


GARY TURNER                                    PLAINTIFF


VS.          DEPOSITION FOR THE DEFENDANT


MARATHON PETROLEUM COMPANY, LP          DEFENDANT


*    *    *


DEPONENT:  GARY A. TURNER

DATE:      OCTOBER 4, 2018


KITTY SHAY, CM
Certified Court Reporters
P.O. Box 5505
Louisville, Kentucky  40255-0505
(502) 648-6390
certifiedreporterslouisville.com

EXHIBIT 1

2

INDEX

Examination by Mr. Hornback.................... 5
Examination by Barnett......................184
Further Examination by Mr. Hornback..........188
Reporter's Certificate........................191

EXHIBITS

Exhibit No. 1.................................. 11
     (Resume)
Exhibit No. 2.................................. 19
     (Marathon Employment Application)
Exhibit No. 3.................................. 26
     (Letter to Gary A. Turner from Katie E.
     Scherer dated 6-20-12)
Exhibit No. 4.................................. 29
     (Employment Offer Summary dated 6-14-12)
Exhibit No. 5.................................. 33
     (Physical Abilities Test Consent Form
     dated 6-24-12)
Exhibit No. 6.................................. 35
     (Job description for utility operator)
Exhibit No. 7.................................. 37
     (Equal Employment Opportunity policy
     at Marathon)
Exhibit No. 8.................................. 38
     (Harassment Policy at Marathon)
Exhibit No. 9.................................. 39
     (Code of Business Conduct for Marathon)
Exhibit No. 10................................. 42
     (New Employee Orientation (NEO) form
     dated 8-5-12)
Exhibit No. 11................................. 47
     (General Work Rules)
Exhibit No. 12................................. 52
     (CRLLC Training Detail Report)
Exhibit No. 13................................. 78
     (New Hourly Employee Evaluation Form)
Exhibit No. 14................................101
     (Document entitled Investigation
     Meeting with Gary Turner, December 26,
     2012 at 2 p.m.)
Exhibit No. 15................................119
     (U.S. Equal Employment Opportunity
     Commission Intake Questionnaire)

3

INDEX (Continued)

Exhibit No. 16................................131
     (Civil Summons; Complaint)
Exhibit No. 17................................133
     (Plaintiff's FRCP 26(c) Initial
     Disclosures)
Exhibit No. 18................................137
     (Plaintiff's Responses to Defendant's
     First Interrogatories; Plaintiff's
     Responses, Defendant's First Requests
     for Production of Documents to
     Plaintiff)
Exhibit No. 19................................172
     (City of Huntington 901 Form)
Exhibit No. 20................................175
     (Application for Employment dated
     8-12-14)
Exhibit No. 21................................176
     (Letter to Lt. G. A. Turner from
     Greg Fuller dated 5-21-04)
Exhibit No. 22................................177
     (Findings of fact and conclusions of
     law of the Firemen's Civil Service
     Commission)

4

APPEARANCES

FOR THE PLAINTIFF:

     EDWARD E. DOVE
     LAURA J. REYNOLDS
     201 West Short Street, Suite 300A
     Lexington, Kentucky  40507
     MICHAEL A. BARNETT
     271 West Short Street, Suite 102
     Lexington, Kentucky  40507

FOR THE DEFENDANT:

     MICHAEL D. HORNBACK
     SARAH T. LAREN
     Littler Mendelson, P.C.
     333 West Vine Street, Suite 1720
     Lexington, Kentucky  40507

ALSO PRESENT:
     DAWN SMITH

5

1        The deposition of GARY A. TURNER,
2   taken in the offices of Edward E. Dove, 201 West
3   Short Street, Suite 300A, Lexington, Kentucky, on
4   Thursday, the 4th day of October, 2018, at
5   approximately 9:55 a.m.; said deposition being
6   taken pursuant to Notice for use in accordance
7   with the Federal Rules of Civil Procedure.
8
9                    *  *  *
10
11        GARY A. TURNER, after first being duly
12   sworn, was examined and testified as follows:
13
14                    *  *  *
15
16               EXAMINATION
17
18   BY MR. HORNBACK:
19        Q.     Could you state your name for the
20   record, please, sir.
21        A.     Gary Arness Turner.
22        Q.     What's your middle name?
23        A.     Arness, A-R-N-E-S-S.
24        Q.     Okay.  Mr. Turner, my name is
25   Michael Hornback.  We met a few minutes ago before

**6**

1  the deposition started.  I and my law firm
2  represent Marathon in this case that you
3  filed.  Have you ever given a deposition before?
4       A.    Yes.
5       Q.    Okay.  How many times have you given
6  a deposition?
7       A.    Twice.
8       Q.    Okay.  What was the first time you
9  gave a deposition?  Do you remember what year that
10 was generally?
11      A.    1994.
12      Q.    What kind of case was that?  Were
13 you a party or a witness?
14      A.    Party.
15      Q.    Okay.  What kind of case was it?
16      A.    Discrimination law case.
17      Q.    And that was race discrimination;
18 correct?
19      A.    Yes.
20      Q.    That was against --
21      A.    City of Huntington.
22            COURT REPORTER:  I didn't hear what
23 you said.
24            THE WITNESS:  City of Huntington.
25            MR. DOVE:  You need to speak up.

**7**

1  I'm having trouble hearing you too.
2            THE WITNESS:  Okay.
3       Q.    And the second deposition, when was
4  that?
5       A.    Well, on the fire department, being
6  an officer, I was witness to a vehicle versus
7  pedestrian.
8       Q.    So just a witness in that case?
9       A.    Uh-huh.
10      Q.    You've been through this obviously
11 twice before then, but I'll give you a few ground
12 rules real quick.
13      A.    Okay.
14      Q.    You've been doing a good job so far,
15 but speak up so we can all hear you, if you don't
16 mind.
17      A.    Sure.  Sure.
18      Q.    Give verbal responses, yes or no,
19 rather than shaking your head.  It's easier for
20 the court reporter to take down your answer that
21 way.  If I ask an unclear question, which will
22 happen, I guarantee that will happen --
23      A.    Got you.
24      Q.    -- if you don't understand, you just
25 let me know, okay?  I'll try to rephrase it.

**8**

1       A.    Will do.
2       Q.    If you'll let me finish asking a
3  question before you start to answer, I'll try to
4  extend to you the same courtesy just so the court
5  reporter can take down everything accurately.  All
6  right?
7       A.    Sure.
8       Q.    Okay.  And if you need a break at
9  any time, let me know.  I'm sure I'll have to take
10 a break, so if you need to use the restroom,
11 whatever, just let me know and we'll do that.
12 Have you taken any medications today?
13      A.    No.
14      Q.    Is there any reason that you feel
15 like your deposition shouldn't go forward today?
16      A.    Not at all.
17      Q.    Okay.  What's your current home
18 address?
19      A.    1817 Artisan Avenue, A-R-T-I-S-A-N
20 Avenue, Huntington, West Virginia 25703.
21      Q.    And are you married?
22      A.    Sure.
23      Q.    Okay.  What's your wife's name?
24      A.    Rosemary Elaine.
25      Q.    Okay.  How long have you been

**9**

1  married to her?
2       A.    16 -- 16 years.
3       Q.    Congratulations.  Is she employed?
4       A.    Sure.
5       Q.    Where does she work?
6       A.    Marshall University police
7  department.
8       Q.    Okay.
9       A.    Public safety.
10      Q.    Okay.  Do you have any family
11 members that reside in the Ashland area that are
12 over 18 years old?
13      A.    No.
14      Q.    Other than talk with your attorney,
15 what did you do, if anything, to prepare for your
16 deposition today?
17      A.    Just read over notes or case work,
18 case log.
19      Q.    Okay.  Read over notes, are those
20 notes that you had handwritten down or is it stuff
21 inside this lawsuit?
22      A.    Inside the lawsuit.
23      Q.    Now, where did you go to high
24 school?
25      A.    Huntington High.

## 10

1  Q.      Been in Huntington your whole life?
2  A.      Born in Logan, West Virginia, but
3  54 years of Huntington.
4  Q.      Okay.  Great.  Did you attend
5  college?
6  A.      Sure.
7  Q.      Marshall; is that right?
8  A.      Sure.  Uh-huh.
9  Q.      We'll look at some of your
10 employment -- or your educational background here
11 in just a second.  After college, and I don't want
12 to go through every job, but can you just tell me
13 generally after college what your employment
14 history was, what you did.
15 A.      Well, I was older.  Going through
16 college I was already employed, employed and going
17 to college.  I was with the fire department when I
18 graduated from college.
19 Q.      I got you.  Okay.  And you were
20 employed with the fire department until 2011; does
21 that sound about right?
22 A.      That's right.  That's correct.
23 Q.      Is that when you retired from the
24 fire department?
25 A.      Yes, sir.

## 11

1  Q.      And what rank did you have at the
2  time you retired?
3  A.      Captain.
4  Q.      And we've got several exhibits here,
5  some of them will be quicker than others, but I'll
6  try to be as quick as I can with them.  Mark that
7  one.
8      (TURNER DEPOSITION EXHIBIT 1 MARKED)
9  Q.      Mr. Turner, this appears to be your
10 resume; is that right, sir?  It's been marked as
11 Exhibit 1 to your deposition.
12 A.      Sure.
13 Q.      And at the bottom you'll see numbers
14 there.  It says PLA and then it has -- the number
15 79 is the last two digits.
16 A.      Oh, okay.
17 Q.      That signifies that you produced
18 this document to us in discovery.  Okay?
19 A.      Uh-huh.
20 Q.      I wanted to talk a little bit about
21 your resume.  Under objective it says, current
22 employment as a utility operator; is that right?
23 A.      That's correct.
24 Q.      Is this the resume then that you
25 submitted to Marathon when you were applying for a

## 12

1  job?
2  A.      That's correct.
3  Q.      Okay.  Under experience you list
4  retired captain from the Huntington, West Virginia
5  Fire Department; right?
6  A.      Uh-huh.
7  Q.      Then the next bullet point down
8  under experience it says, current card holder as a
9  hazardous material technician; do you see that?
10 A.      That's correct.  Uh-huh.
11 Q.      What is a hazardous material
12 technician?
13 A.      You're just trained to identify and
14 mitigate hazardous material, basically.
15 Q.      What type of hazardous material?
16 A.      Hazardous material could be anything
17 in the military.
18 Q.      That was training you got in the
19 military; is that right?
20 A.      Also in the fire department.
21 Q.      Okay.  Do you still hold that --
22 A.      It's expired.
23 Q.      It's expired, okay.  Did you hold it
24 while you were employed at Marathon?
25 A.      Sure.  Uh-huh.

## 13

1      MR. DOVE:  You have to say yes or
2  no.
3      THE WITNESS:  Yes.
4  Q.      What type of training did you have
5  to go through to get that card as a hazardous
6  material technician?
7  A.      Various classroom hours, hands-on
8  training.
9  Q.      Was there any -- was safety training
10 a part of that generalized training that you
11 received to get that card for hazardous material
12 technician?
13 A.      Safety is one.
14 Q.      What type of safety training do you
15 recall or safety training you went through
16 to get that card; do you recall?
17 A.      No.  No.
18 Q.      The next bullet point down says,
19 current certification of technical transportation
20 of hazardous material; do you see that?
21 A.      Yes, I do.
22 Q.      Okay.  What is technical
23 transportation of hazardous material?  What's
24 that --
25 A.      I was what's called an 88 Mike in

---

**14**

1  the military and you're in charge of properly
2  receiving, checking paperwork and hauling to
3  wherever it's designated to go.
4        Q.      Was safety training also a part of
5  that?
6        A.      Yes, sir.
7        Q.      Do you recall what type of safety
8  training you received for that?
9        A.      Just various safety, lifting,
10 marking, identifying and written stuff.
11       Q.      And in both of those instances where
12 you were card holder as the hazardous material
13 technician and then being certified as a technical
14 transportation of hazardous material, was safety
15 an important aspect of those --
16       A.      Yes.
17       Q.      -- two certifications for card
18 holder?
19       A.      Yes.
20       Q.      And that's because you were dealing
21 with hazardous material that could be harmful to
22 you or others; is that right?
23       A.      Yes.
24       Q.      If you go down under work history on
25 your resume, you said you currently work full time

---

**15**

1  in the capacity as a decontamination observer,
2  controller/trainer with -- I think that's the West
3  Virginia Army National Guard --
4        A.      Army National Guard.
5        Q.      -- is that right?  Okay.  What type
6  of training did you do while you were -- are you
7  still -- let me back up.  Are you still employed
8  at all with the West Virginia Army National Guard?
9        A.      No, sir.
10       Q.      Okay.  When did you stop that
11 employment?
12       A.      May of 2013.
13       Q.      Was there any particular reason?
14       A.      Retired.
15       Q.      Okay.  Were you responsible for
16 training other individuals in the National Guard
17 at that time?
18       A.      Yes, sir.
19       Q.      What type of training would you give
20 those individuals?
21       A.      Being an E7 you are in charge of
22 millions dollars of equipment, PMCS, which is
23 preventive maintenance checks and services.
24              (OFF THE RECORD)
25       Q.      Sorry about that.  Before the phone

---

**16**

1  rang we were talking about training that you
2  actually conducted for others at the National
3  Guard.  What type of training did you do for
4  others?
5        A.      Being in the transportation field
6  you train, drive trucks, various sizes from
7  tractor trailer down to cut V, which is smaller
8  trucks, PMCS, which I said, which is preventive
9  maintenance checks and services, you're in charge
10 of all of the training just in general.  Pretty
11 much 19 evolutions in the National Guard we do.
12 Can't verbatim state 1 through 19, but you do that
13 every year.
14       Q.      Okay.  Did you ever have an instance
15 where you were training folks and you felt like
16 those individuals just weren't picking up on the
17 training or weren't doing well with their
18 training?
19       A.      Not that I recall.
20       Q.      So everybody you trained picked up
21 on what they were supposed to be doing without any
22 problems?
23       A.      They were tracking according to
24 schedule, yes.
25       Q.      And if they weren't tracking

---

**17**

1  according to schedule, what would you have done in
2  those instances with their training?
3        A.      Remedial training.
4        Q.      More training?
5        A.      Yes.
6        Q.      And if they weren't picking up that
7  training, would they be subject to being either
8  terminated or not allowed to do certain activities
9  because they weren't picking up on the training?
10       A.      No, sir.
11       Q.      Under education on your resume,
12 which is Exhibit 1, you list Marshall University
13 in Huntington; is that right?
14       A.      That's correct.
15       Q.      And you got a Regents Bachelor's of
16 Arts Degree; is that right?
17       A.      That's correct.
18       Q.      When did you get that degree, if you
19 recall?
20       A.      2009.
21       Q.      Okay.  And then you had an Associate
22 Applied Science Degree in December of 2007.  Is
23 that also from Marshall?
24       A.      Marshall Community College, yes.
25       Q.      And then so you have a minor in

---

18

1  safety technology; is that right?
2      A.     That's correct.
3      Q.     When did you -- did you receive that
4  minor in 2007 as well?
5      A.     That's included in your bachelor's.
6      Q.     I got you.  So that would have been
7  2009?
8      A.     Uh-huh.
9      Q.     What -- tell me a little bit about
10 the curriculum of safety technology.  What did you
11 study to get that honor?
12     A.     Diverse curriculum they put you
13 through as far as your math, science, chemistry,
14 physics.  The whole nine.
15     Q.     Let me back up for a second.  When
16 you were doing training for the folks in the
17 National Guard, it was important that they
18 followed your direction; correct?
19     A.     Yes, sir.
20     Q.     And it was important that they
21 adhere to the safety protocols that you were
22 trying to teach them; correct?
23     A.     Yes, sir.
24     Q.     Do you still have a technical
25 transportation of hazardous materials certificate?

19

1      A.     Not active.  I still have the
2  card --
3      Q.     Okay.
4      A.     -- but they expired four or five
5  years or whatever.
6      Q.     Okay.  Let me hand you the next
7  exhibit here.  We'll try to get through some of
8  these.  You'll see that we paper clipped them just
9  so they're easier for the court reporter, but try
10 to keep them all together here.
11     (TURNER DEPOSITION EXHIBIT 2 MARKED)
12     Q.     There you go.  If you'll take a look
13 at Exhibit 2 again.  This is a document that you
14 produced in discovery and -- or with your --
15 produced to us at some point in this lawsuit.
16 Does this look like the employment application
17 that you filled out for Marathon prior to going to
18 work there?
19     A.     That's correct.
20     Q.     Okay.  Down at the bottom of
21 Exhibit 2 it goes through your educational
22 background again; is that right?
23     A.     That's correct.
24     Q.     Okay.  Some of this we've already
25 talked about, so I don't want to belabor the

20

1  point.  If you look on the second page of that
2  document down at the bottom you'll see PLA and the
3  last two numbers are 77.  Do you see that?
4      A.     Yes, I do.
5      Q.     In the middle of that page you go
6  through your employment and business experience
7  and the first thing you list there is City of
8  Huntington Fire Department; is that right?  Do you
9  see that?
10     A.     Oh, yes.
11     Q.     Okay.  All right.  And it says your
12 dates of employment there were February of -- or,
13 excuse me, February of 1989 through November of
14 2011; is that right?
15     A.     That's correct.
16     Q.     Okay.  And then under that you list
17 your responsibilities or duties; is that correct?
18     A.     Yes, sir.
19     Q.     It says, incident command on
20 emergency scenes, written reports, training,
21 emergency medical assessments and types of
22 treatment on scenes, in charge of daily
23 inspections and functions of fire stations; is
24 that right?
25     A.     That's correct.

21

1      Q.     I want to ask you, did you conduct
2  training for other fire departments -- or,
3  excuse me, other fire department employees while
4  you were with the City of Huntington Fire
5  Department?
6      A.     Yes, I did.
7      Q.     What types of trainings did you do
8  for other employees?
9      A.     Well, each station has its
10 uniqueness, some have ladder trucks, some have
11 rescue trucks, some have fire truck engines.  Just
12 depending on the truck, you are responsible for
13 making sure your team for that day is, you know,
14 familiar with all the equipment on it, how to use
15 it properly.
16     Q.     Did you conduct any safety training
17 for the employees of the fire department?
18     A.     Safety is always part of it.
19     Q.     Okay.  Do you recall what kind of
20 safety training you provided to the other members
21 of the fire department?
22     A.     Lifting, checking, PMCS again,
23 maintenance, making sure it's there in operational
24 condition.
25     Q.     Okay.  When you were employed

22

1   with -- I think you said you retired at the rank
2   of captain; is that right?
3       A.      Yes, sir.
4       Q.      And you have to excuse me.
5       A.      Okay.
6       Q.      But the captain rank, did you have
7   the ability to hire and fire anybody or was
8   that --
9       A.      No.
10      Q.      -- a supervisory role?
11      A.      No, I didn't.
12      Q.      Was it a supervisory role?
13      A.      Uh-huh.  Yes, sir.
14      Q.      Now, did you ever have an instance
15  at the fire department where an individual was not
16  doing well with the training, wasn't picking up on
17  the training that they were being provided?
18      A.      No.
19      Q.      Never?
20      A.      Well, they're trained to do the job.
21  Each station has its uniqueness to its trucks.
22  Somebody might be filling whatever block of
23  training is for that day, you just going over
24  that.
25      Q.      Did you ever have a feeling that one

23

1   of the firefighters that you were supervising
2   wasn't fit to do the job for any reason?
3       A.      Never.  Never.
4       Q.      Never occurred?
5       A.      No.
6       Q.      If you turn over to the next page
7   that's marked PLA and the last two numbers 78.
8   You also list as employment self-employed
9   contractor; is that right?
10      A.      That's correct.
11      Q.      And you did that from 1988 to 2001;
12  is that right?
13      A.      That's correct.  Well, it's still
14  ongoing as far as the title but not the business.
15      Q.      Okay.  Do you still today do any
16  contracting work?
17      A.      Not contracting, but I do remodeling
18  of family friends.
19      Q.      So you do that even today?
20      A.      Yes, sir.
21      Q.      Do you do that under any type of
22  business name or is that just you?
23      A.      No, no, I don't do it as business,
24  just mainly helping.
25      Q.      Okay.  Do you get paid for that

24

1   work?
2       A.      Family, no; friends, a little.
3       Q.      Okay.  That's the way it normally
4   goes; right?  All right.  Down at the bottom you
5   have a few references listed there, one of which
6   is Ernest Fitzpatrick; is that right?
7       A.      That's correct.
8       Q.      And you list his occupation as being
9   at Marathon Oil; is that right?
10      A.      That's correct.
11      Q.      How do you know Ernest Fitzpatrick?
12      A.      I grew up from five, six years old
13  to the present.
14      Q.      He was employed at Marathon Oil at
15  the time that you submitted this application, I
16  guess?
17      A.      Yes.
18      Q.      Do you know what his role at
19  Marathon was?
20      A.      He had a crew.  He was, I guess, the
21  number one operator in the south end.
22      Q.      Okay.  Do you know how long
23  Mr. Fitzpatrick had been employed at Marathon?
24      A.      He retired after 35 years.
25      Q.      So he spent 35 years there?

25

1       A.      Yes.
2       Q.      And he was an operator, as far as
3   you know?
4       A.      Yes.  Definitely an operator.
5       Q.      Is that the same type of position
6   that you were applying for at Marathon?
7       A.      No.
8       Q.      Okay.
9       A.      Well, operators, yes, but not his
10  position.
11      Q.      Oh, yes, sir.  I'm sorry.  Not his
12  specific position but the same general type of
13  work --
14      A.      Yes.
15      Q.      -- that was being done?  Okay.  So
16  he worked there for 35 years?
17      A.      That's correct.
18      Q.      And what is his race?
19      A.      Black.
20      Q.      Did he -- do you know when he
21  retired?  Let me ask you this, a better question,
22  was he there when you started working at Marathon?
23      A.      Yes, he was.
24      Q.      Was he there when your employment
25  with Marathon ended?

---

**26**

1    A.    Yes, he was.
2    Q.    Okay.  I'll go ahead and mark No. 3
3    here.
4        (TURNER DEPOSITION EXHIBIT 3 MARKED)
5    Q.    Mr. Turner, if you'll take a look at
6    what's been marked as Exhibit No. 3.  This appears
7    to be a June 20th, 2012 letter from Marathon
8    directed to you at your address you gave earlier;
9    is that right?
10   A.    That's correct.
11   Q.    And essentially this is an offer or
12   a letter outlining an offer and your acceptance
13   for a position as utility operator; is that right?
14   A.    That's correct.
15   Q.    Okay.  It lists here in the top
16   paragraph there, right at the top, it says your
17   starting training rate is at 18.79; is that right?
18   A.    That's correct.
19   Q.    Okay.  And then it says your
20   tentative scheduled start date is Monday,
21   August 6th; is that right?
22   A.    Yes, sir.
23   Q.    Okay.  Did you start your employment
24   with Marathon on August 6th of 2012?
25   A.    Yes, I did.

---

**27**

1    Q.    Okay.  Do you recall how long you
2    were paid this starting training rate of $18.79 an
3    hour?
4    A.    The first two months.
5    Q.    Okay.  So that would have put you
6    into September, October?
7    A.    October 1st.
8    Q.    October 1st.  And what do you recall
9    happened on October 1st of 2012 with regard to
10   your position or pay?
11   A.    You went up to the 32 dollar and
12   some odd cent rate.
13   Q.    Okay.  All right.  And on October
14   1st, is that when your training period essentially
15   ended or what was your understanding of that
16   October 1st date with regard to your job?
17   A.    As far as the way they outlined it,
18   I don't know but the training was continuous until
19   around Thanksgiving, as the best I can recollect.
20   I went in the plant full time out of training
21   around Thanksgiving.
22   Q.    Around Thanksgiving, okay.  Now,
23   when -- did you go through any type of interview
24   process with Marathon prior to being hired on?
25   A.    Yes, sir.

---

**28**

1    Q.    Okay.  Do you recall who you
2    interviewed with at Marathon?
3    A.    Pretty much.
4    Q.    Tell me who you interviewed with.
5    A.    Jay Johnson, his last name Turner,
6    Joe Turner.  What was my supervisor's name, I want
7    to say Rice but --
8    Q.    David Rice?
9    A.    David Rice.  Uh-huh.
10   Q.    Okay.
11   A.    David Rice.
12   Q.    What about -- I think Katie?
13   A.    Katie Scherer, S word, Scherer,
14   whatever it is.
15   Q.    Yeah, let's spell that.  It may
16   have -- I think it's actually changed now, maybe
17   she got married, but it's Katie S-C-H-E-R-E-R?
18   A.    That sounds right.
19   Q.    Okay.  So you met with Katie as
20   well, interviewed with Katie?
21   A.    Yes, sir.
22   Q.    Okay.  Anybody else you interviewed
23   with that you recall?  What about Mr. Naliborski?
24   Do you remember that name?
25   A.    I know the name.  I don't know if he

---

**29**

1    was with one of the interviewers or not.
2    Q.    Anybody else that you recall that
3    you interviewed with?
4    A.    Not right off, no.
5    Q.    Was that a one -- was that
6    essentially one interview, you went in for one
7    interview and talked to these folks or was it
8    multiple interviews?
9    A.    All separate.  Well, Jay and Rice
10   were together, Katie and Joe were separate.
11   Q.    Okay.  So you went in for two
12   separate interviews; is that right?
13   A.    It was all in one day.
14   Q.    I understand.  I apologize.
15   A.    It would be three separate
16   interviews.
17   Q.    Do you recall generally how long
18   that interview day lasted?
19   A.    No, I don't.
20   Q.    Okay.  I'm going to hand you what
21   we'll mark as Exhibit 4 real quick.
22       (TURNER DEPOSITION EXHIBIT 4 MARKED)
23   Q.    And this is -- Exhibit 4 is an
24   offer -- an employment offer summary that you
25   produced in this case.  If you look down at the

---

## 30

1  bottom there, Plaintiff 81; do you see that?
2      A.    You say I produced?
3      Q.    Yes, sir.
4            MR. DOVE:  That means I gave it to
5  them, I gave it to them.
6            THE WITNESS:  Yes, sir.
7      Q.    And I'm sorry, yeah, I'm not trying
8  to confuse you.  It was given to us by your
9  attorney --
10     A.    That's correct.
11     Q.    -- through the mechanisms of this
12 lawsuit.
13           MR. DOVE:  You gave it to me.
14     Q.    And what I want to talk about for a
15 second here is the salary section, fourth area
16 down there, it says training rate of 18.79 an
17 hour; is that right?
18     A.    That's correct.
19     Q.    AND it says utility starting rate,
20 $24.77; is that right?
21     A.    That's correct.
22     Q.    Okay.  Did you make -- I'm sorry?
23     A.    I said, that's correct, that's what
24 it says, yeah.
25     Q.    Did you make this utility starting

## 31

1  rate of $24.77 per hour?  Did you ever make that?
2      A.    You know, I don't recall if we had
3  went to the 24.  Did we go -- if we went to the 24
4  I don't remember when we went to the 24, but in
5  October we went to 32.
6      Q.    Okay.
7      A.    I'm pretty sure.
8      Q.    If Marathon, if some of your pay
9  records show that you were getting paid $24.77 per
10 hour at the end of your -- you know, at the end of
11 your employment with Marathon, would you have any
12 reason to dispute that, if that's what it showed
13 you were making?
14     A.    Well, I had pay stubs that show when
15 I went to $32 an hour in November.
16     Q.    So you've got pay stubs that show
17 that?
18     A.    Sure.
19     Q.    Okay.  And I guess those are things,
20 pay stubs you could get to your lawyer pretty
21 easily; is that right?
22     A.    Yes.
23     Q.    Okay.  Would you mind doing that so
24 he can just shoot them to us?  We just want to
25 make sure I'm understanding.  Okay?

## 32

1      A.    Sure.
2      Q.    Now, when you accepted the position
3  as a utility operator with Marathon in -- I
4  believe you said you started on August 6th of
5  2012; is that right?
6      A.    That's correct.
7      Q.    And it was at the Catlettsburg
8  refinery; is that right?
9      A.    You started in their training, it's
10 a school on their property but you wasn't in the
11 refinery.
12     Q.    Okay.  And then you eventually
13 transferred into performing work in the refinery;
14 correct?
15     A.    October 1st we went to the refinery.
16     Q.    Explain to me a little bit what the
17 refinery -- your understanding of what the
18 refinery actually does from a functional
19 standpoint.
20     A.    They take crude and make product out
21 of it, make product out of it, gas, asphalt and
22 various other things, but I'm only aware of those.
23     Q.    Okay.  So you're working around
24 crude oil that's being turned into, at least in
25 some instances, gas; is that right?

## 33

1      A.    Yes, sir.
2      Q.    That's a dangerous environment;
3  correct?
4      A.    Correct.
5      Q.    And there are many different
6  procedures that you would have to perform as a
7  utility operator; is that right?
8      A.    That's correct.
9      Q.    Would you agree that safety at a
10 petroleum refinery facility is important?
11     A.    Yes.
12     Q.    And you wouldn't want the person
13 next to you to not be up to speed on their job and
14 put you at risk, would you?
15     A.    No.
16     Q.    Let me hand you what we'll mark as
17 the next exhibit, I guess Exhibit 5.
18           MR. DOVE:  Yes.
19     (TURNER DEPOSITION EXHIBIT 5 MARKED)
20     Q.    Again, this is a document that
21 came -- oh, I'm sorry.  I'm sorry.  It came from
22 your counsel in this lawsuit.  This appears to be
23 a physical abilities test consent form; is that
24 right?
25     A.    That's correct.

34

```
1    Q.    And you executed this in June of
2  2012 before you started your employment with
3  Marathon but after you accepted the position;
4  correct?
5    A.    Correct.
6    Q.    Okay.  And it's essentially a
7  physical capability test for the position of the
8  utility operator; correct?
9    A.    Yes.
10   Q.    And the things listed there on
11 Exhibit 5 are the things -- essentially the
12 physical abilities that you would have to do in
13 order to properly perform the utility operator
14 position; right?
15   A.    Yes.
16   Q.    And one of those is opening and
17 closing various size valves; is that right?
18   A.    Yes.
19   Q.    Okay.  And through this form you
20 circled yes and yes to both questions indicating
21 that you were physically able to do all of these
22 things listed, including opening and closing
23 various size valves; right?
24   A.    Yes.
25   Q.    Let's take a look at the next one
```

35

```
1  here, Exhibit 6.
2        (TURNER DEPOSITION EXHIBIT 6 MARKED)
3    Q.    Again, this is a document that we
4  got from you in the process of this litigation and
5  it looks like a job description for a utility
6  operator; is that right?
7    A.    Yes, sir.
8    Q.    Okay.  And that's the job that you
9  held at the Catlettsburg facility; right?
10   A.    Yes, sir.
11   Q.    I want you to read through the
12 responsibilities real quick, just read them to
13 yourself and then I have a couple of questions.
14        MR. DOVE:  Definitely not for old
15 men.
16        (OFF THE RECORD)
17   Q.    Are you done reading the
18 responsibilities section?
19   A.    Pretty much.
20   Q.    Okay.  Do you agree that all of
21 those things listed there are part of the
22 responsibilities of the utility operator?
23   A.    Yes, sir.
24   Q.    Okay.  The last bullet point says,
25 operators will be expected to learn refining
```

36

```
1  process, operation/tank farm product movements and
2  qualify on process/tank farm jobs.  Operators are
3  expected to learn and work multiple jobs, up to
4  and including the console operator position,
5  control refinery process through computer system.
6  Did I read that correctly?
7    A.    Yes, sir.
8    Q.    Okay.  And that was a responsibility
9  of the utility operator from what you recall?
10   A.    That's part of your training, yes.
11   Q.    Then under qualifications, if you
12 look at -- there's several qualifications there on
13 this job description, but if you look at the fifth
14 one, fifth bullet point down under qualifications,
15 it says, ability to learn complex refinery related
16 material; is that right?
17   A.    Yes, sir.
18   Q.    Okay.  Could you describe to me
19 what -- in your experience the types of things the
20 utility operator is responsible for during your
21 employment at the Catlettsburg facility.
22   A.    Basically, as it says, you make
23 rounds starting out in the morning, you have a.m.
24 meeting first.  If you're not handed a specific
25 task or a different task, then you go and proceed
```

37

```
1  with your day as you're trained to make your
2  rounds.  Sometimes throughout the day you collect
3  the sample.  In our case as utility operators we
4  did what's called MaraLearn.  You do your
5  computer-based training on a computer.
6    Q.    I'm talking about -- I appreciate
7  that.  On a daily basis you said that the refinery
8  has dangerous materials there, right, petroleum,
9  crude oil being made into gas in some instances.
10 Did you work around -- I would presume you worked
11 around the petroleum products and the refining
12 process; right?
13   A.    Our product is in pipes.  You're
14 just checking valves, gauges --
15   Q.    Okay.
16   A.    -- sounds.  You have what's called a
17 radar.  It's a gun that you're taking with you to
18 show that you were Location A, Location B,
19 according to the radar, it tells you what to do.
20   Q.    Okay.  I got you.  Okay.  Hand you
21 the next one here.
22        (TURNER DEPOSITION EXHIBIT 7 MARKED)
23   Q.    What's been marked as Exhibit 7 to
24 your deposition.  It's again a document that we
25 got from your counsel.  This appears to be the
```

**38**

```
 1   equal employment opportunity policy at Marathon;
 2   is that right?
 3        A.     That's correct.
 4        Q.     And you were aware of this policy at
 5   the time you were employed by Marathon; correct?
 6        A.     Yes, sir.
 7        Q.     And you received at least some
 8   training that this policy existed; correct?
 9        A.     Yes, sir.
10        Q.     Okay.  I hand you the next exhibit
11   here.
12         (TURNER DEPOSITION EXHIBIT 8 MARKED)
13        Q.     Exhibit 8 to your deposition.  This
14   appears to be the harassment policy at Marathon;
15   is that correct?
16        A.     That's correct.
17        Q.     This is a policy you were aware of
18   that Marathon had at the time of your employment;
19   is that right?
20        A.     That's correct.
21        Q.     This is also a policy that you were
22   trained on?
23        A.     These what you call training, we
24   just received these papers.  I mean, there's no
25   training, I guess.
```

**39**

```
 1        Q.     Did you go through any kind of
 2   computer-based system that you had to read the
 3   policy and check that you read the policy?
 4        A.     Yeah.
 5        Q.     Okay.  Hand you the next exhibit
 6   here.
 7         (TURNER DEPOSITION EXHIBIT 9 MARKED)
 8        Q.     This is again another document that
 9   we got from you in this litigation.  This is
10   Marathon's code of business conduct; is that
11   right?
12        A.     That's correct.
13        Q.     And this is the code of conduct that
14   you were aware existed at Marathon at the time of
15   your employment; is that right?
16        A.     That's correct.
17        Q.     And you were also given that
18   computerized training where you had to read
19   through it and check that you did read it;
20   correct?
21        A.     Yes, sir.
22        Q.     And if you turn over to -- at the
23   bottom again, these have PLA and then numbers
24   after it.  If you turn over to PLA 61, on that
25   page it has a section entitled Diversity and then
```

**40**

```
 1   right under it, it has a section entitled
 2   Discrimination; is that right?
 3        A.     That's correct.
 4        Q.     Then under that it also has a
 5   section entitled Safety and Health; is that right?
 6        A.     That's correct.
 7        Q.     And under that section it says, we
 8   are committed to providing a safe and healthy
 9   workplace.  Each of us is responsible for
10   observing all of the safety and health rules that
11   apply to our jobs.  We're -- we are responsible --
12   excuse me, we are all responsible for taking
13   precautions to protect ourselves and our fellow
14   employees from an accident, injury or unsafe
15   condition.  Additionally, each of us must promptly
16   report unsafe or unhealthy conditions and take
17   steps to correct those conditions immediately.
18   Did I read that correct without my stuttering?
19        A.     Yes, sir.  Yes, sir.
20        Q.     And then the next page, 62, PLA 62,
21   it has a section about environment in communities.
22   And I won't read through them specifically but
23   essentially that safety is important for the
24   environment and the communities in which Marathon
25   operates up at Catlettsburg; is that right?
```

**41**

```
 1        A.     That's correct.
 2        Q.     Turn over to PLA 70.  That page
 3   talks about if you have any questions regarding
 4   the code of business conduct and then also
 5   provides an integrity help line phone number to
 6   call if you have any issues, is that right, during
 7   your employment?
 8        A.     I don't see a phone number but...
 9        Q.     If you look over on the right-hand
10   side it says, questions, concerns, talk to
11   management.
12        A.     Got you.
13        Q.     And then right to the left of that
14   box it says integrity help line and if you see the
15   indented piece there it says 855 and then gives
16   some other numbers there to call?
17        A.     Yes, sir.
18        Q.     Did you ever call the integrity hot
19   line for any reason during your employment with
20   Marathon?
21        A.     No.
22        Q.     But you knew you could do that if
23   you had any issues; correct?
24        A.     Not directly, no.
25        Q.     Well, you were trained
```

Gary Turner

10/4/2018

**42**

1  electronically on this to the extent that you had
2  to read this document and check off that you read
3  it; correct?
4      A.      Correct.
5      Q.      Okay.  I hand you the next exhibit
6  document here.
7      (TURNER DEPOSITION EXHIBIT 10 MARKED)
8      Q.      Exhibit, I believe, 10 to your
9  deposition.  This is also something you produced
10  to us.  Is that your signature at the bottom on
11  8-6-2012?
12     A.      Yes, sir.
13     Q.      That's the day you began employment
14  with Marathon; is that right?
15     A.      Yes, sir.
16     Q.      And on this is that your handwriting
17  on the top?
18     A.      Yes, sir.
19     Q.      And you have various things checked
20  off that are called covered materials, one of
21  which is the code of business conduct via
22  MaraLearn; is that right?
23     A.      Yes, sir.
24     Q.      Is MaraLearn the electronic --
25     A.      Computer-based training.

**43**

1      Q.      Got you.  Emergency procedures, you
2  have that checked off as well.
3      A.      Yes, sir.
4      Q.      Do you remember what emergency
5  procedures were covered with you on 8-6-2012?
6      A.      No, I don't.
7      Q.      Okay.  It says corporate policies
8  and has a check mark under that.  It says you were
9  directed to visit MaraMore -- MaraView corporate
10  policy channel for a copy of and a review of
11  current policies; is that right?
12     A.      Yes, sir.
13     Q.      So you had access to corporate
14  policies that you could review via that MaraView
15  electronic-based training system; is that right?
16     A.      On this date?
17     Q.      During your employment.
18     A.      Corporate policies.  I don't
19  understand what -- could you ask that again.
20     Q.      Sure.  I'm sorry.  You have
21  corporate policies and then next to it you put a
22  check mark; correct?
23     A.      Correct.
24     Q.      And I guess I was asking do you
25  remember what corporate policies you either looked

**44**

1  at or had access to that resulted in you putting a
2  check mark there?
3      A.      I'm trying to think here.
4      Q.      And I know it's been awhile.  I'm
5  not trying to trip you up, I'm just...
6      A.      On this date, if I remember
7  orientation, this was orientation, you were given
8  several of these papers to do exactly what you did
9  there, fill out, and you just put your check
10  there.  It was not any training that you received,
11  just making you aware of what these things, what
12  they're -- what Deborah Keeney was putting out at
13  that time.
14     Q.      I got you.  Okay.  Then under that
15  it says, by signing below I verify that I attended
16  a new employee orientation facilitated by human
17  resources and/or representative of the company.
18  As part of that orientation I was informed about,
19  made aware of and directed to review corporate
20  policies as well as the company's code of business
21  conduct.  Did I read that correctly?
22     A.      Yes, you did.
23     Q.      And then you signed that verifying
24  those things; correct?
25     A.      Yes.

**45**

1      Q.      Do you remember, the new employee
2  orientation, who facilitated that for Marathon, if
3  you recall?
4      A.      Like throughout the day you had
5  various people come in to give you their spiel of
6  what you are entitled to or what their
7  expectations were or just different things like
8  that throughout the day.
9      Q.      Do you know -- we mentioned
10  Mr. Naliborski earlier.  Do you recall him being
11  at your training for any reason -- or your
12  orientation?  Excuse me.
13     A.      At orientation?  Not necessarily
14  that day.  I don't remember him, but as you learn
15  the people, I had seen him at various times
16  throughout the -- he wasn't part of the training,
17  he just come in I guess to look at us to introduce
18  himself and things like that.
19     Q.      Do you recall how many individuals
20  were in your orientation class?
21     A.      Ten of us.
22     Q.      Okay.  Ten.  Do you recall how many
23  of those folks were white as opposed to how many
24  were African-American?
25     A.      Eight white and two

**46**

1  African-American.

2      Q.      Who was the other African-American?

3      A.      Let me think of his name, Rodney

4  Boykin.

5      Q.      Boy --

6      A.      B-O-Y-K-I-N, Boykin.  I might be

7  misspelling it, but that's...

8      Q.      Sure.

9      A.      Rodney is his first name.

10     Q.      Rodney?

11     A.      Rodney.

12     Q.      Did Rodney make it through all of

13  the training and start his position at Marathon

14  after training -- after training ended?

15     A.      Sure.

16     Q.      Do you know if Rodney is still

17  employed there or not?

18     A.      I say so, but I don't -- unless he

19  was fired within the last year or so.  I haven't

20  seen Rodney in a year or so.

21     Q.      But he was still employed at

22  Marathon when your employment ended?

23     A.      Yes.

24     Q.      Okay.  If we don't -- if you-all

25  don't mind taking a break real quick, I had a

**47**

1  little bit too much coffee.

2                  (RECESS)

3      (TURNER DEPOSITION EXHIBIT 11 MARKED)

4      Q.      All right.  Mr. Turner, we're back

5  on the record.  You've been handed what's been

6  marked as Exhibit 11 to the deposition, again a

7  document you gave us.  And I'm not -- when I say

8  you gave it to us, we probably produced a lot of

9  the same stuff.  We probably gave your side some

10  of this stuff, too, but I just pulled it from what

11  you gave us.  This is -- appears to be some

12  general work rules for Marathon; is that right?

13     A.      That's correct.

14     Q.      At the Catlettsburg refinery; is

15  that accurate?

16     A.      That's correct.

17     Q.      And if you turn to the last page,

18  it's PLA 154.  Is that your signature there, sir?

19     A.      Yes, sir.

20     Q.      Okay.  And the date there is

21  August 6th, 2012.  That would have been the first

22  date that you reported to work for Marathon; is

23  that right?

24     A.      That's correct.

25     Q.      And right above your signature or

**48**

1  your name there it says, I have received and I am

2  responsible for reading and following the

3  Catlettsburg refinery general work rules dated

4  February 1, 2012; is that right?

5      A.      That's correct.

6      Q.      Okay.  All right.  Turn back to the

7  first page for me, the number one or the first

8  listed general work rule relates to safety; is

9  that right?

10     A.      That's correct.

11     Q.      It says, all employees are

12  responsible for compliance with plant safety rules

13  as well as any job or department-specific rules.

14  This includes, but is not limited to, life

15  critical safety rules, safe work instructions,

16  operating procedures and wearing all required

17  protective clothing and equipment; is that right?

18     A.      That's correct.

19     Q.      Did you have to wear protective

20  clothing and equipment in your job as a utility

21  operator?

22     A.      Yes.

23     Q.      Okay.  Why would you have to wear

24  protective clothing and equipment in your job as a

25  utility operator?

**49**

1      A.      Well, you're around loud noises, so

2  you're wearing ear protection at all times.

3  You're in fire possibility area, so all clothing

4  is fire retardant.  Eye protection if you're doing

5  any grinding or -- I wouldn't be grinding, but

6  anything to do with eyes, you have to put your

7  safety goggles on.

8      Q.      Okay.  So just you want to wear that

9  safety --

10     A.      Hard hats and the like.  Excuse me.

11     Q.      No, you're fine.  Hard hats and what

12  else?

13     A.      Steel-toed shoes.

14     Q.      All right.  And you mentioned you

15  would be in circumstances that could have a fire

16  possibility; is that right?

17     A.      That's correct.

18     Q.      And so the clothing would be fire

19  retardant I think is what you mentioned?

20     A.      Yes, sir.

21     Q.      How often were you in an environment

22  where a fire could occur?  Was that on a daily

23  basis just by virtue of your job?

24     A.      Yes, sir.

25     Q.      Under the safety work rule there's a

**50**

1  harassment policy there again; correct?
2      A.    Yes, sir.
3      Q.    Okay.  And you understood that was a
4  general work rule at Marathon; correct?
5      A.    Yes, sir.
6      Q.    And then it goes through -- and I
7  certainly don't want to -- I don't want to go
8  through every one of these.  But it goes through
9  several other work order rules and then if you
10 turn to Page 150 for me.  On that page there's a
11 section entitled Application of Discipline.  Do
12 you see that?
13     A.    Yes, sir.
14     Q.    And essentially what that section
15 says, and I'm going to try to summarize it, so you
16 tell me if I'm right, that a violation of the
17 general work rules may result in disciplinary
18 action, but it's really up to the company on what
19 disciplinary action and there may be circumstances
20 that warrant a first offense being discharge
21 essentially; is that pretty much an accurate
22 summary?
23     A.    Specific offenses, I don't see first
24 offense.  Does it say that in here?
25     Q.    Well, it says the following

**51**

1  prohibitions -- let me see.  Yeah, the last
2  sentence, the following prohibitions are not all
3  inclusive and other conduct not specified herein
4  may warrant discipline up to and including
5  discharge for the first offense.
6      A.    Yes.
7      Q.    Okay.  And if you turn over to the
8  next page, PLA 151, No. 6 says, job negligence,
9  unsafe work practices, performing work in a
10 careless nature or violation of any of the life
11 critical rules; do you see that?
12     A.    Yes, sir.
13     Q.    What was your understanding of the
14 life critical rules?  What were those?
15     A.    Companywise I don't know what that's
16 reflecting but...
17     Q.    From your perspective what were the
18 life critical rules or...
19     A.    If you did something blatantly wrong
20 or -- let's see, how would I say that, if you
21 were -- if you were negligent.
22     Q.    Okay.  And negligent means you don't
23 mean to do something wrong, you just made a
24 mistake; right?  Is that the way you would look at
25 negligence?

**52**

1      A.    I would look at negligence as
2  negligent.  It's negligent.  You're -- I don't
3  have the college background to know what
4  negligence is, but negligence is doing something
5  that you know better than to do.  You know the
6  difference but you negligently did the opposite.
7      Q.    I want go through the next -- you
8  know, we've been flying through -- I think I'm
9  done with that one.  Thank you, sir.  We have been
10 going through quickly some of these documents and
11 the next one, you know, may take us a little bit
12 more time.  Okay?
13     A.    That's fine.
14     (TURNER DEPOSITION EXHIBIT 12 MARKED)
15     Q.    This is a training -- CRLLC training
16 detail report for you, sir, that Marathon produced
17 in this case.  I think you produced certain number
18 of pages but this is the one we had.  Do you
19 recall seeing a document like this before?
20     A.    Yes, sir.
21     Q.    Okay.  And I know it's long and I
22 want to go through certain entries here with you,
23 but do you have any reason to dispute that this
24 encapsulates the training that you received while
25 you were an employee at the Marathon Catlettsburg

**53**

1  refinery?
2      A.    This is computer-based training,
3  yes.
4      Q.    And what is CRLLC?  Do you know what
5  that is?
6      A.    I have no idea.
7      Q.    You don't -- you don't know what --
8      A.    I don't know what it stands for, if
9  that's what you're asking me.
10     Q.    What does LPCCR stand for?
11     A.    Low pressure continuous catalyst
12 regenerator.
13     Q.    Low pressure --
14     A.    Continuous catalyst.
15     Q.    Continuous.
16     A.    Regen.
17     Q.    Catalyst?
18     A.    Regen, regenerator.  Regen is what
19 they call regenerator.
20     Q.    Okay.  What is that?  Tell me what
21 your understanding of that is.
22     A.    That's a unit that's at your area.
23     Q.    A unit at the refinery?
24     A.    Yes.
25     Q.    What type of activity was done in

54

1    the LPCCR unit at the Catlettsburg refinery?
2        A.       Taking naphtha, which is gasoline,
3    and processing it.
4        Q.       Processing it into what?  Various
5    things?
6        A.       Naphtha is a pure gasoline and you
7    process it to various products of different
8    gasolines.
9        Q.       So that would be an area at the
10   plant where you've got a significant fire risk;
11   would you agree with that?
12       A.       Sure.
13       Q.       A risk of explosion; would you agree
14   with that?
15       A.       Sure.
16       Q.       Okay.  And I think the easiest way
17   for me to do this is start at the back of
18   Exhibit 12 and we'll work our way forward, if
19   that's okay with you.
20       A.       That's fine.
21       Q.       So the first or the back page, I
22   think it's marked -- let me make sure I'm getting
23   the right numbers for you-all right -- it's
24   Marathon 129.  Are you with me on that?
25       A.       Yes, sir.

55

1        Q.       All right.  If you start at the
2    bottom of that page and work up, the first one
3    there is new hire basic operator training that you
4    took on 8-31 of 2012; is that right?
5        A.       Yes, sir.
6        Q.       Okay.  And then it has the credit
7    hours that you received for that, that's 80 hours;
8    is that right?
9        A.       That's correct.
10       Q.       Okay.  And that's consistent
11   throughout this document.  You're welcome to take
12   a look at it, but you have -- for the vast
13   majority of these trainings you have a credit hour
14   that you were given for -- a certain number of
15   credit hours you were given for the specific
16   training that's listed; correct?
17       A.       Correct.
18       Q.       If you move up to there, you have
19   new hire operator qualifying tasks; do you see
20   that?
21       A.       Oh, yes.  Yes.
22       Q.       And that says -- has a date of
23   10-22-2012; is that right?
24       A.       Correct.
25       Q.       And that's a 40-hour allocation, is

56

1    that right, for your credit hours?
2        A.       I don't know how they base it on
3    40 hours.  I guess that's from the time you start
4    taking these.  I don't know how they base it, just
5    says 40.
6        Q.       Right above that it says LPCCR/BRU
7    unit operator qualification; do you see that?
8        A.       Yes.
9        Q.       And that says November 11, 2012; is
10   that right?
11       A.       That's correct.
12       Q.       Is that when you were qualified to
13   work on the LPCCR unit?
14       A.       I don't know what that date
15   reflects, but that's about when we went and
16   started into the plants, yes.
17       Q.       Did everybody in your training class
18   start in the plant at the same time or did folks
19   go into the plant some earlier, some later, that
20   kind of thing?
21       A.       We all went in at the same time, to
22   my knowledge.
23       Q.       Okay.  If you would turn now to
24   Page 127 of Exhibit 12.  Right in the middle of
25   the page it says, diversity skills and awareness

57

1    for employee, employee has one E on it there.  Do
2    you see that?
3        A.       Yes, sir.
4        Q.       And do you recall what that
5    diversity skills and awareness for employee
6    training was related to?
7        A.       Other than what it says, diversity
8    skills and training, that would be what I would
9    say it is.
10       Q.       Diversity in the workplace, that
11   kind of thing?
12       A.       Yes.
13       Q.       Okay.  If you go up a couple lines
14   there, there's a process safety management
15   overview.  Do you see that?
16       A.       Yes, sir.
17       Q.       Do you recall what that process
18   safety management overview training was about or
19   anything?
20       A.       Just reading what it says, it's the
21   process, safety management process.
22       Q.       If you go to the next page, 126.  If
23   you go up four entries from the bottom, do you see
24   that?
25       A.       Uh-huh.

**58**

1   Q.      It says, control of owning
2   department LOTO lock keys; is that right?
3   A.      Yeah.
4   Q.      What is LOTO?  Is that
5   lockout-tagout?
6   A.      Tagout.
7   Q.      And that's training you received on
8   August 13th of 2012; is that right?
9   A.      That's correct.
10   Q.      The one right above that says, check
11   valve PPT, and then it has some numbers after
12   that.  Do you recall what that was about or just
13   based on your knowledge of your job, do you know
14   what that would be about?
15   A.      PPT, I don't know what those
16   initials stand for right off, but we definitely
17   had whatever it is.  I don't know what the PPT
18   stands for.
19   Q.      Okay.  How to check -- were you
20   trained on like how to check valves if there was a
21   leak or if they were operating the way they were
22   supposed to operate?
23   A.      Rephrase that again.
24   Q.      Sure.  This says check valves and it
25   has some stuff after it.  I was just asking

**59**

1   generally do you recall receiving training on how
2   to check a valve to make sure it was operating
3   correctly or whether there was a problem with the
4   valve?
5   A.      Are you asking me is that a --
6   excuse me, one more time ask that question.
7   Q.      Sure.  And take it away from that
8   document, okay, just generally.
9   A.      Uh-huh.
10   Q.      Were you trained on how to check
11   valves to make sure they were operating
12   accurately?
13   A.      At that time, that's continuous.
14   Q.      That's a continuous thing throughout
15   your employment at Marathon; is that accurate?
16   A.      Right.
17   Q.      Okay.  Right above that it says WBT
18   process safety management.  That's on August 13th
19   as well.  Do you know what that's about?  Does
20   that ring any bells with you, that training?
21   A.      All of it rings a bell, so that --
22   yes.
23   Q.      Okay.  Do you know what that was
24   about, safety precautions, maybe, or anything like
25   that?

**60**

1   A.      On this date that's -- can I
2   elaborate what I'm trying to say?
3   Q.      Sure.  Sure.
4   A.      On this date, the 13th, you see many
5   things happened on the 13th.  That's just that
6   computer-based training, you're going through it
7   and completing your task.  That's the assignment
8   they give you.
9   Q.      And so -- and you mentioned this
10   earlier and I appreciate you bringing that up.  Up
11   until -- from the point you were hired in August
12   up until I think you said October 1st, maybe, you
13   were working on a computer, is that accurate,
14   training on a computer?
15   A.      Not only, no.
16   Q.      Were you doing things on site at the
17   refinery during that period?
18   A.      Not in the refinery.  You did tours
19   in the refinery during that training period but
20   you was working on a Genie, it's a forklift type
21   thing, you know, those things that stretches,
22   forklifts.  You did various training, not only
23   just computer training.
24   Q.      I think you mentioned they had like
25   a training facility; is that right?

**61**

1   A.      A school, yes.
2   Q.      A school, okay.  Was that at a
3   different location than the refinery --
4   A.      Yes.
5   Q.      -- or was that on the same property?
6   A.      It's a great big property, you can
7   imagine, but the school is separate from the
8   refinery.
9   Q.      Were you doing most of your training
10   -- oh, sorry.
11   COURT REPORTER:  I'm sorry, I didn't
12   hear your answer.
13   A.      The school was in a residential
14   neighborhood and the refinery is a lot more toward
15   the -- it's locked away from that.  Still their
16   property.
17   Q.      Okay.  Would it be accurate to say
18   that from August when you -- August of 2012, I
19   believe, when you started with Marathon, up until
20   October 1st of that year, that most of your
21   training was either on a computer or at that
22   school location rather than in the refinery
23   itself?
24   A.      Yes.
25   Q.      Okay.  Still on Page 126, right

**62**

1   above the WBT process safety management, there's
2   an entry called old LOTO handling; do you see
3   that?
4        A.    Yes, sir.
5        Q.    And that's again lock out/tag out
6   handling?
7        A.    Yes, sir.
8        Q.    Do you recall anything about that
9   training session or being trained generally on
10  lock out/tag out procedures?
11       A.    Again, that's all just a computer.
12  These are all on a computer.  You just went down
13  reading and answering questions and you get a
14  score.
15       Q.    If you turn over now to Page 124.
16  If I'm going too fast for you, tell me to slow
17  down.  I'm just...
18            There's a lot of training on here.
19  Are you on Page 124?
20       A.    Yes, sir.
21       Q.    About the middle of the page, a
22  little bit below the middle of the page do you see
23  an entry called hazard recognition awareness?  Do
24  you see that?
25       A.    Yes, sir.

**63**

1        Q.    And that was a training on August
2   6th -- or, excuse me, August 16th, 2012; is that
3   right?
4        A.    Yes.
5        Q.    And what -- generally what types of
6   hazards were you trained about related to your job
7   as an operator or as, I guess, a utility operator
8   there at Marathon?  What types of hazards were you
9   trained on?
10       A.    On that date or as --
11       Q.    Just generally, not on that specific
12  date.  What hazards were you aware of there at the
13  refinery as it relates to your job?
14       A.    Well, of course they trained on all
15  the various fire safety, chemicals, safety,
16  lifting.  Anything that relates to safety, I mean,
17  germane to their plant were instructed on.
18       Q.    Okay.  If you turn to 122 for me.
19  If you look from the bottom up, okay, four entries
20  up it says, WBT not to exceed, paren, NTE, end
21  paren; do you see that?
22       A.    Uh-huh.
23       Q.    Do you have an understanding of what
24  a not to exceed is or an NTE?
25       A.    Yes.

**64**

1        Q.    What is that?
2        A.    Not to exceed limit.
3        Q.    Tell me what your understanding of
4   that is.
5        A.    Every -- I'm going to say every, but
6   instruments have a not to exceed level because of
7   what's inside the pipe could -- how would you say
8   it -- make the pipe unstable or whatever, or
9   whatever is inside it, you're not to exceed a
10  certain level of pressure or whatever or it could
11  be hazardous to the structure of the pipe itself.
12       Q.    Okay.  So make sure I'm
13  understanding because I'm not in that line of
14  work, if there is a not-to-exceed incident, that
15  means that the pressure got to a point that it
16  could be hazardous in some way to the material
17  that's in the pipe essentially?
18       A.    Not to the material but to the pipe
19  itself.
20       Q.    To the pipe itself?
21       A.    Yes.
22       Q.    Could that place the people working
23  around that particular pipe or instrument, could
24  that put the people at risk that were working
25  around that, for example, a pipe?

**65**

1        A.    Everything has safety valves and
2   everything has two.  If it has a not-to-exceed
3   level, it has relief valves, whether it's pressure
4   relief or whatever, so that has a two-stage safety
5   mechanism.  In order for it to reach its really
6   eruptible point, those valves have to also
7   malfunction.
8        Q.    In your opinion is a not to exceed,
9   NTE, incident at a petroleum refinery, would you
10  consider that to be, you know, a concerning
11  situation?
12       A.    It's according to what the product
13  is.
14       Q.    You mentioned that at the LPCCR
15  facility, they had gasoline; is that right?
16       A.    Yes.
17       Q.    Would an NTE in a gasoline unit be
18  something that you would be concerned about
19  generally?
20       A.    I wouldn't, no.
21       Q.    Did you have a -- I'm sorry?
22       A.    Because there's other safety
23  measures -- matters dealing with steam.
24       Q.    Okay.  Did you have any previous
25  experience working in a refinery before coming to

**66**

1  Marathon in August of 2012?
2      A.    No.
3      Q.    Okay.  If you look again on Page 122
4  at the top it says code of business conduct
5  commitment card, 8-17 of 2012.  Does that just
6  reflect that again you filled out that or you
7  looked at the business -- the code of business
8  conduct to Marathon?  Do you see it at the top
9  there?
10     A.    Yes, I see it.
11     Q.    Okay.  Is that -- again, I think you
12 testified to this, but you had knowledge of the
13 code of business conduct; correct?
14     A.    Yes, sir.
15     Q.    And that reflects -- I think you
16 mentioned earlier that you had a computer-based
17 system that maybe you had to read it and check
18 off.  Is that what you think that is there?
19     A.    That's what all this is.
20     Q.    If you turn over to 122, right in
21 the middle of the page it says WBT Marathon
22 workplace harassment; do you see that?
23     A.    On 122?
24     Q.    121, I apologize.  121, I apologize.
25 Right in the middle of the page there?

**67**

1      A.    WBT environmental awareness you
2  said?
3      Q.    I'm sorry, WBT Marathon workplace
4  harassment.
5      A.    Got you.
6      Q.    And that's just training on the
7  workplace harassment policy; is that right?
8      A.    Yes.
9      Q.    If you go to the next Page 120, page
10 forward.  Sorry.
11     A.    Got you.
12     Q.    At the top it says WBT diversity
13 orientation; is that right?
14     A.    Yes, sir.
15     Q.    Is that -- do you have any
16 recollection what that was?
17     A.    Computer-based training.
18     Q.    On diversity?
19     A.    Read and answer questions on that.
20 Uh-huh.
21     Q.    If you turn to the next page, 119,
22 again going from the back to the front, the second
23 one up there, it says, CBG refining general work
24 rules, salary; do you see that?
25     A.    Yes.

**68**

1      Q.    And is that training related to the
2  safety rules that we looked at previously, I think
3  were Exhibit 11 to your deposition?
4      A.    Are you asking is it the same as
5  that?
6      Q.    Was it training on the work rules,
7  if you recall?
8      A.    Well, that -- as far as what it
9  says, yes.
10     Q.    Do you recall getting training on
11 the work rules, at least this computer-based
12 training?
13     A.    The computer-based training, yes.
14     Q.    If you turn over to 116 for me.
15 Third entry from the top of that page it says, WBT
16 lockout/tagout.  Do you see that?
17     A.    Yes, sir.
18     Q.    Okay.  Describe to me what your
19 understanding of lockout/tagout is with respect to
20 your job at Marathon.
21     A.    Lockout/tagout is you're getting a
22 set of locks and paperwork to a lockout, some
23 equipment, from being opened or used and
24 identifying it on the paperwork what, where and
25 when you locked something out and tagged it out.

**69**

1  It has a lock and a tag.
2      Q.    And that entry just reflects that
3  you received training on the lockout/tagout
4  procedures via this computer-based learning; is
5  that right?
6      A.    That's correct.
7      Q.    Turn to the next page, 115.  Third
8  one up from the bottom, let's do that.  It says,
9  taking a control valve out of service.  Was that
10 again something you received training on via this
11 computer-based training?
12     A.    Yes, sir.
13     Q.    Steaming and bleeding equipment.
14 Again, that's something you received training on;
15 right?
16     A.    Yes, sir.
17     Q.    Starting a standard process pump is
18 the next one up; is that right?
19     A.    Yes, sir.
20     Q.    Returning a pump to service after
21 MTN, which I'm assuming is maintenance; is that
22 right?
23     A.    Your guess would be as good as mine
24 on MT.
25     Q.    I got you.  The one above that says,

70

```
 1   putting sight glass with ball valve back in
 2   service; do you see that?
 3      A.      Yes, sir.
 4      Q.      What is a sight glass?
 5      A.      Sight glass is just a glass.  It
 6   could be big or -- you know, some of their
 7   equipment is big, so it could be big or small,
 8   just a sight glass you're looking at liquid level
 9   or you're looking at flame or...
10           It's just a sight glass.
11      Q.      Okay.  And would you ever have to --
12   what type of work would you do on a site glass as
13   a utility operator?
14      A.      No work, it's just something you're
15   looking through.  It's just...
16      Q.      It says, putting sight glass with
17   ball valve back in service.  Were there times
18   where sight glass with a ball valve would be taken
19   out of service, I guess?
20      A.      Putting sight glass with -- oh,
21   excuse me, putting sight glass with ball valve in
22   service.  I'm trying to think what that's saying.
23   Then your question again was?
24      Q.      Well, really my question is, is
25   there any type of service that you would perform
```

71

```
 1   on a sight glass?
 2      A.      I never did that, if that's what
 3   you're asking me, no.
 4      Q.      But were you trained on different
 5   mechanisms or different procedures you would have
 6   to perform on a sight glass?
 7      A.      I would say yes.
 8      Q.      Okay.  The one above that says,
 9   putting a control valve in service; do you see
10   that?
11      A.      Yes, sir.
12      Q.      That's something else you were
13   trained on; right?
14      A.      Yes, sir.
15      Q.      Then the top one there says,
16   isolating a block valve; do you see that?
17      A.      Yes, sir.
18      Q.      And you received training on that
19   one as well; correct?
20      A.      Yes, sir.
21      Q.      And this was all computer based at
22   this point, we're into September of 2012?
23      A.      Uh-huh.  Now, some of those -- all
24   would not be the correct word.  Some of that stuff
25   is hands on.  I see -- let's see, start -- what
```

72

```
 1   was that one we was looking at?  It's our next --
 2      Q.      Starting a standard process pump?
 3      A.      Yeah.
 4      Q.      Okay.
 5      A.      Some of that stuff they would have
 6   seasoned operators show you what they're doing
 7   while you're looking at them do this.  It's
 8   nothing you're doing but you're going around
 9   throughout the plant, throughout your area,
10   looking at various things that the worker on --
11   actually doing that job is doing.
12      Q.      Okay.  Fair enough.  Turn over to
13   113 with me.  Second one down from the top it
14   says, new hire operator qualifing tasks, and then
15   it has a date of 9-27-2012; correct?
16      A.      Yes.
17      Q.      Okay.  Was that -- the new hire
18   operating qualifing tasks, was that a test, so to
19   speak, to see if you were doing the task that
20   Marathon wanted you to do correctly or what do you
21   remember about that?
22      A.      It sounds like almost what you're
23   describing, you just -- the culmination --
24   accumulation of your training, you're getting a
25   hands-on or -- but it's based on all -- from the
```

73

```
 1   look at the hours, it's based on the accumulation
 2   of your training and now you're qualifying, I
 3   guess you'd say, to --
 4      Q.      To go --
 5      A.      -- see could you do it.
 6      Q.      Okay.  And you took that on
 7   9-27-2012; is that right?  That's the date --
 8      A.      That's the date but it's got
 9   40 hours on there.  You do 40 hours in a day
10   but --
11      Q.      Right.
12      A.      -- I guess it's the accumulation.
13      Q.      Right.  Okay.  Fair enough.  Do you
14   know if -- did you take this test once or do you
15   recall?
16      A.      It's really not a test.
17      Q.      Okay.
18      A.      It's not a written test, you're just
19   saying can you operate -- if he asks you to
20   operate or turn this valve or, you know, you
21   just -- or in my remembrance of it could you do
22   what he asked you to do.
23      Q.      Okay.  Fair enough.  If you turn
24   over to 109 for me.
25      A.      109?
```

74

```
 1    Q.      109, yes, sir.  Four down it says,
 2  new hire operator qualifying tasks and this one
 3  says -- has a date of 10-22-12; do you see that?
 4    A.      Uh-huh.
 5    Q.      Do you recall having to go through
 6  another qualifying -- another qualifying period
 7  between the 9-27 one we just looked at for new
 8  hire operator qualifying tasks and this
 9  October 22nd?
10    A.      No.
11    Q.      Okay.  Are you aware of anyone else
12  in your group having to go through two separate
13  qualifying periods?
14    A.      Yeah.  Yes and no.
15    Q.      Okay.  Tell me about that.  You say
16  yes and no with regard to two separate qualifying
17  periods.  Tell me what you mean.
18    A.      The gentleman that was put before
19  our group, he was hired with our group but he did
20  this task before, Nick Warnock, and he -- I don't
21  know what reason but had to rego through with our
22  group.
23    Q.      Had to rego through what now?
24    A.      With our group.
25    Q.      With your group?
```

75

```
 1    A.      Yes.
 2    Q.      And what was his name?
 3    A.      Nick Warmick, Warnick -- Warnock.
 4  W-A-R-N-O-C-K, Warnock.
 5    Q.      All right.
 6    A.      If that's what that's, you know,
 7  asking.
 8    Q.      Sure.
 9    A.      If that's what you're asking, do I
10  know of anybody that had to redo that.
11    Q.      That's the only person you know of?
12    A.      Yes.
13    Q.      And then if you turn to 107, the
14  first page there, sir, at the top it says basic
15  operator training level 3 survey, and that's
16  10-29-12; do you see that?
17    A.      12-29?
18    Q.      Or I'm sorry, 12-29-12; do you see
19  that?
20    A.      Yes.
21    Q.      Do you have any recollection of what
22  that basic operator training level 3 survey was?
23    A.      I wasn't on duty that day, so I
24  wouldn't have no idea what that reflects.
25    Q.      Okay.  I know there's a lot of
```

76

```
 1  training in here and I know that you produced
 2  these -- some of these pages as well.  I mean, do
 3  you have any reason to believe this isn't an
 4  accurate summary of the training that you went
 5  through either on the computer or otherwise while
 6  you were employed at Marathon?
 7    A.      Based on that question, 12-29, I
 8  wasn't on duty that day, so why would that be
 9  there and I wasn't on duty?  I don't know why it's
10  there.
11    Q.      Okay.
12    A.      I went off December 26th and came
13  back January the 2nd, so I don't know why that
14  would...
15    Q.      Did you have any Level 3 basic
16  operator training prior to leaving Marathon?  Do
17  you remember anything about that?
18    A.      On that date -- I just can say that
19  date I was not on duty.  What Level 3 survey is, I
20  don't know.
21    Q.      And I'm not talking about the date
22  in particular, I'm just talking about the basic
23  operator training level three survey, do you
24  recall ever having to do anything that related to
25  that prior to you leaving Marathon, whether it was
```

77

```
 1  in December or November or October, anything like
 2  that?
 3    A.      If it's reflected in my training
 4  record that I did training -- whatever they
 5  consider training level 3 survey, if it's
 6  reflected in there with a date I was there, I
 7  guess I did it, but that date I was not on duty.
 8    Q.      Okay.  Fair enough.  Now, you
 9  mentioned Dave Rice as being one of the
10  individuals I think that you met with during the
11  interview process at Marathon; is that right?
12    A.      That's correct.
13    Q.      Who was -- who is Dave Rice from the
14  standpoint of his position at Marathon when you
15  were employed there; do you know?
16    A.      Dave Rice is called -- let's see,
17  what is his title.
18    Q.      How about area operations
19  supervisor; does that ring a bell?
20    A.      He's the boss, so that rings a bell.
21    Q.      Okay.  So Dave was the boss in your
22  mind?
23    A.      He was the boss.
24    Q.      All right.  He was one of your
25  supervisors; correct?
```

**Page 78**

```
 1        A.      If he's the boss, yes.  He's not a
 2  direct supervisor, he's a supervisor supervisor.
 3        Q.      Who was your supervisor?
 4        A.      Whichever supervisor is on duty at
 5  that moment.  There's various supervisors.
 6        Q.      Okay.  Did you ever talk to Dave
 7  Rice?
 8        A.      Yes, as in conversation?
 9        Q.      Uh-huh.
10        A.      Well, sure.
11        Q.      Did Dave Rice ever give you any
12  helpful hints about your job or try to tell you
13  how to do things properly or anything like that?
14        A.      He was never in -- never talked to
15  him in the work environment, but when you're in
16  the control room just general conversation.
17        Q.      Was that general conversation about
18  work?
19        A.      I would say no.
20        Q.      Okay.  Let me hand you the next
21  exhibit here.  Make that Exhibit 13.
22          (TURNER DEPOSITION EXHIBIT 13 MARKED)
23        Q.      This appears to be a new hourly
24  employee evaluation form on Marathon letterhead
25  that again we got from your counsel in this case
```

**Page 79**

```
 1  and -- is that right?
 2        A.      Repeat that one more time.
 3        Q.      Is this the new hourly employee
 4  evaluation form from Marathon related to you?
 5        A.      Yes.
 6        Q.      And if you turn to the last page, is
 7  that your signature there under employee
 8  signature?
 9        A.      Yes, sir.
10        Q.      Who is the foreman signature; do you
11  recognize that?
12        A.      Ryan Christian.
13        Q.      Ryan Christian.  And then the human
14  resources reviewer, is that Katie Scherer?
15        A.      No, it looks like -- is that --
16        Q.      Katie something else, maybe?
17        A.      Yeah, that's her.  It looks like
18  Katie.
19        Q.      I guess since Katie interviewed you,
20  you know what she looks like; right?
21        A.      Oh, yeah.
22        Q.      Is that the same Katie on this --
23        A.      She wasn't there for this.  She
24  signed that the day after.
25        Q.      But it's the same Katie you think?
```

**Page 80**

```
 1        A.      Yes.
 2        Q.      And it looks like your signature is
 3  10-29 of 2012; is that right?
 4        A.      Yes.
 5        Q.      And that's close to -- maybe a
 6  little bit before but close to 30 days after you
 7  went into the facility on October 1st; is that
 8  right?
 9        A.      That's correct.
10        Q.      And actually into the refinery out
11  of the computer-based training kind of thing?
12        A.      Right.
13        Q.      Okay.  If you go back to the first
14  page there, and I want to go through each of these
15  with you -- each of these areas with you, personal
16  competencies, and I'm not going to read every
17  single thing but the heading is strives for
18  excellence; do you see that?
19        A.      Uh-huh.  Yes.
20        Q.      And it lists you as on target and
21  the comment is, has demonstrated a good attitude
22  and a desire to learn; is that right?
23        A.      That's correct.
24        Q.      And that's what at least Ryan
25  Christian said about you; is that right?
```

**Page 81**

```
 1        A.      That's correct.
 2        Q.      As of October 29?
 3        A.      That's correct.
 4        Q.      Under stress management it has an
 5  N/A; do you see that?
 6        A.      Yes, I do.
 7        Q.      And it says, has not been observed
 8  in a stressful environment; do you see that?
 9        A.      Yes, sir.
10        Q.      Okay.  If you turn to the page --
11  the next page, interpersonal competencies, such
12  as -- and the heading there is teamwork and that
13  also says N/A; is that right?
14        A.      That's correct.
15        Q.      Then on communication, under that he
16  gave you a mark of does not meet expectations; do
17  you see that?
18        A.      Yes, I do.
19        Q.      And it says, need to improve on
20  terminology; do you see that?
21        A.      Yes, I do.
22        Q.      Okay.  Do you agree with that
23  evaluation as of October 29, 2012, that you needed
24  to improve on terminology with respect to your job
25  at Marathon?
```

**82**

1  A.    At that point Ryan is the day
2  foreman.  He had never worked with us, not one
3  day.  Where he got that need to improve on
4  terminology, I don't know because he was not part
5  of our training.
6  Q.    So are you saying you never worked
7  with Ryan Christian?
8  A.    He's the day foreman, he wasn't in
9  the training.  This is still in training.
10  Q.    Well, this is December -- excuse me,
11  October 29, so you've been in the plant --
12  A.    Yes, sir.
13  Q.    -- from October 1st to October 29;
14  right?
15  A.    Yes, sir.
16  Q.    What shift did you work?
17  A.    I don't see a date.  I want to say C
18  shift but it could be D.
19  Q.    What is -- well, tell me what
20  C shift is first.
21  A.    Well, you got four shifts, A, B, C
22  and D.
23  Q.    Okay.  What is C shift?  Tell me
24  when those hours are.
25  A.    Well, it's all what you call shift

**83**

1  work.
2  Q.    I understand.  What time does the
3  shift start and what time --
4  A.    7 a.m.  Oh, wait a minute, wait a
5  minute.  It's called shift work.  Shift work, you
6  start at 7 a.m., 3 p.m. or 11 p.m.
7  Q.    Okay.  When does C shift start?
8  A.    Whatever date you're scheduled to
9  start.
10  Q.    Okay.  So you could --
11  A.    What I'm saying, throughout the
12  month say you work four days, off a day because
13  you've worked 20 in a day -- 20 in a month, it
14  just breaks down.  It's kind of hard to explain.
15  You work four, you're off one, you come back for
16  one, then you're off two, you go to another shift,
17  still the same C shift, that's your crew, C crew,
18  maybe what I might be saying.  But you just
19  staggering through the month, day shift, evening
20  shift and night shift.
21  Q.    Okay.  So did -- between October 1st
22  and October 29 of 2012, did you ever work a day
23  shift?
24  A.    You worked all day shifts.
25  Q.    So you were all day shifts October 1

**84**

1  through October 29?
2  A.    Yes.
3  Q.    And --
4  A.    And even further.
5  Q.    And even further than that?
6  A.    Yes.
7  Q.    And Ryan Christian was there on day
8  shift; right?
9  A.    Yes.
10  Q.    Do you know if Ryan -- did you ever
11  work with Ryan Christian in any crew or in an area
12  that Ryan Christian worked in?
13  A.    No, sir.
14  Q.    Do you know if Ryan Christian talked
15  with the people you did work with to gain their
16  knowledge of what they thought your work product
17  was like at that time?
18  A.    If I said the job I'm sure he did.
19  Q.    Okay.  The next area here on Page
20  PLA 182 is functional competencies and the heading
21  there is safety and environmental; do you see
22  that?
23  A.    Yes, sir.
24  Q.    And that also has an N/A; is that
25  correct?

**85**

1  A.    That's correct.
2  Q.    Because you had just come into the
3  plant and you hadn't performed enough for them to
4  know safety and environmental, your competencies
5  on that area; is that generally correct?
6  A.    Sounds right.
7  Q.    If you turn to the next page, 183,
8  technical competencies, the first one there is
9  process understanding; do you see that?
10  A.    Yes, sir.
11  Q.    And it says, understanding the
12  operations of all processes and flows within the
13  unit as well as basic principles of chemistry,
14  mathematics, physics and technical drawings.  Did
15  I read that correct?
16  A.    Yes.
17  Q.    And then it has you marked as on
18  target but it has the low end of on target; is that
19  right?  There are three dots.
20  A.    It depends which way you're going.
21  If it's this way, it's low, if that's low, that's
22  where it's marked.  If that end's high -- I don't
23  know which way it's -- does it say left to right
24  or...
25  Q.    Well, if you look there on the right

**86**

1  it starts with exceeds expectations, right, and
2  then it goes to on target?
3       A.    Right.
4       Q.    And then one block to the left of
5  where you're marked, it says, does not meet
6  expectations; is that right?
7       A.    That's correct.
8       Q.    So --
9       A.    Oh, okay. I see how you read that.
10      Q.    So you're on the last mark before
11 does not meet expectations on process
12 understanding; is that right?
13      A.    I would say yes. Yes.
14      Q.    The same with equipment
15 understanding, under that?
16      A.    Yes.
17      Q.    Same with instrumentation; do you
18 see that?
19      A.    Yes.
20      Q.    Turn over to the next page there,
21 184. Process operation, do you see that?
22      A.    Yes.
23      Q.    And it has N/A as well; is that
24 correct?
25      A.    Yes.

**87**

1       Q.    And the comment under that is still
2  in training process; do you see that?
3       A.    Yes.
4       Q.    Were you still in process operation
5  training at that point or any type of training
6  process that you're aware of?
7       A.    Ask that again.
8       Q.    Were you still in training process
9  at that point?
10      A.    Yes. Okay, yes.
11      Q.    Okay. And if we look back at your
12 training records, and we're happy to do it but if
13 you'll trust me for a second --
14      A.    Sure.
15      Q.    My wife will tell you not to do. We
16 looked at earlier on Marathon 113 you took a new
17 hire operating qualifying task on 9-27. And then
18 you took another new hire operating qualifying
19 task on 10-22; correct?
20      A.    I trust it.
21      Q.    Yes, it is.
22      A.    No. Where are you at? Where are
23 you looking at?
24      Q.    Sure. It's 113 of Exhibit 12.
25      A.    I got it. 113.

**88**

1       Q.    113, the second from the top is that
2  new hire operating qualifying task on 9-27. Do
3  you see that?
4       A.    Yes, sir.
5       Q.    And then if you flip over to 109 of
6  that document, flip forward, we have a new hire
7  operating qualifying task on 10-22. Do you see
8  that?
9       A.    Yes, sir.
10      Q.    Okay. And this -- if you go back to
11 the exhibit we were just talking about where it
12 says still in training process, were you still in
13 that basic operator training process? Is that
14 what's reflected here when it says still in
15 training?
16      A.    I don't know what he's reflecting
17 but we were still in training, yeah.
18      Q.    Was everybody in your group still in
19 training --
20      A.    Yes, sir.
21      Q.    -- or certain persons already out of
22 training?
23      A.    Everybody in training.
24      Q.    Okay. Equipment reliability, it
25 also says an N/A and still in training; is that

**89**

1  right?
2       A.    Yes.
3       Q.    And then under troubleshooting it
4  has an N/A and it says, has not had to demonstrate
5  troubleshooting at this time; do you see that?
6       A.    Yes, sir.
7       Q.    And if you turn to the next page,
8  Page PLA 185, there's a summary there; right?
9       A.    Correct.
10      Q.    And the overall -- your overall
11 performance rating was the -- on the low end of on
12 target right next to does not meet expectations;
13 is that right?
14      A.    Will you rephrase that? On -- the
15 low end on --
16      Q.    Sure. It has on target and it has
17 three check marks -- or three little boxes there
18 to fill out; correct?
19      A.    Everybody receives that same low end
20 on target. All of us that prepared these that
21 day, we all were right there.
22      Q.    Okay. So you-all sat down --
23 everybody got their evaluation report and you-all
24 sat down and compared them?
25      A.    No, we talked about -- because that

**90**

1  was the evaluation date, we all knew we was going
2  in evaluation and we talked about how to improve
3  or what you don't -- but everybody got that same
4  mark.
5        Q.    Did everybody get comments that
6  said, Gary has demonstrated a great attitude and
7  desire to learn?  Did everybody get that same
8  comment?
9        A.    I'm sure Swag's would have said Swag
10 has demonstrated, but it wouldn't say Gary.  It
11 would have had his name there.
12       Q.    Gary is slightly behind on basic
13 process operations.  Did I read that correctly?
14       A.    Yes.
15       Q.    Did everybody get the exact same
16 language in theirs?
17       A.    I don't know about language, but
18 it's talking about the on target spot.
19       Q.    So you don't know if anybody else --
20 if anybody else got a comment that they were
21 slightly behind on basic process operations?
22       A.    I have no idea.
23       Q.    And then areas of improvement, Gary
24 needs to work on improving his understanding of
25 process operations, including fluid dynamics,

**91**

1  equipment and instrumentation functions and
2  terminology.  Did I read that correctly?
3        A.    That's correct.
4        Q.    Okay.  And those were noted as areas
5  for improvements for you; right?
6        A.    Right.  Uh-huh.
7        Q.    what did you do to act upon those
8  areas of improvement, meaning what did you do to
9  improve your understanding of process operations,
10 for example?
11       A.    Exactly as they said.  And if you
12 look at the second evaluation, which they have not
13 produced to us that I know of, it says the
14 opposite of all these.
15       Q.    It says what now?
16       A.    Pretty much the opposite of all of
17 these.
18       Q.    Okay.  Did you -- did you not -- did
19 you have a second evaluation?
20       A.    Yes, I did.
21       Q.    when was the second evaluation?
22       A.    In December, middle of December.
23       Q.    And you kept this one, obviously?
24       A.    No, I didn't.
25       Q.    Okay.  Did you keep any documents

**92**

1  from Marathon?
2        A.    He didn't give me either one of
3  these.
4        Q.    But you signed for it; right?
5        A.    You signed that you did the
6  evaluation.  I got these from EOC.
7        Q.    But at the time you signed -- when
8  you were at Marathon you signed this evaluation?
9        A.    Yes.  Uh-huh.
10       Q.    Okay.  So what did you do to improve
11 your understanding of process operations?
12       A.    I'd have to see the second
13 evaluation, but I improved on everything, was on
14 target at that part of your training.
15       Q.    Okay.  Do you recall doing anything
16 specific to better your understanding of process
17 operations?  Talking about specific things you
18 did.
19       A.    To my knowledge of what this
20 evaluation is, is giving you a 30-day evaluation,
21 you learn your job.  I mean, you're either going
22 to learn your job or you're not going to learn
23 your job but, no, I didn't do anything but learn
24 my job.
25       Q.    What did you do to improve on your

**93**

1  understanding of fluid dynamics?
2        A.    Would have to be around the
3  equipment, seeing what he's saying, fluid -- I
4  don't know what he's saying with fluid dynamics,
5  but whatever that is, evidently I improved on it
6  or was up to par with it by the second evaluation.
7        Q.    What about improving on equipment
8  and instrumentation functions, what you do to
9  improve on that?
10       A.    Well, as a utility operator we don't
11 do instrumentations at all.  I don't know why he
12 has that in there at all, but we don't work on
13 instrumentation, we're utility operators.
14       Q.    what did you do to work on --
15 improve on your terminology?
16       A.    Instead of using the word, it's
17 D-E-B-U-T-S, debuts in my -- in the plant, that's
18 called debuts, but just what they call it is what
19 you say it is.  Instead of a compressor -- there's
20 pumps and compressors, if you made a mistake and
21 called that a compressor one time, it's a pump.
22 And just that type terminology is what he's
23 talking about.
24       Q.    Okay.  And it's important to know
25 the correct terminology because if you're trying

**94**

1  to express to somebody what either, A, you've done
2  or, B, they need to do, they need to know exactly
3  what you're talking about; right?
4      A.    That's correct.
5      Q.    And then under training and
6  development plan it says, become a qualified LPCCR
7  process operator; correct?
8      A.    Yes.
9      Q.    And that has a target date of
10  11-11-12?
11      A.    Yes.
12      Q.    Do you know if you became a
13  qualified LPCCR process operator by that target
14  date?
15      A.    The date we tested, I don't know
16  what that was, but, yes.  We was in the plant
17  before Thanksgiving.
18      Q.    Okay.  So I want to talk now moving
19  to the incident that occurred on December 26th,
20  2012.  Do you recall that?
21      A.    Yes, sir.
22      Q.    Where in the facility were you
23  working at the time of this incident on
24  December 26th, 2012?
25      A.    You say where in the facility was I

**95**

1  working?
2      Q.    Uh-huh.
3      A.    You're in your area, LPCCR.
4      Q.    And that's the?
5      A.    Low pressure continuous catalyst.
6      Q.    Right.  Taking gasoline and
7  processing it into other things; is that what you
8  said?  Processing gasoline?
9      A.    That's what the refinery does.
10      Q.    Okay.  Just walk me through the
11  incident on December 26th.  Tell me what you
12  recall happening on that date.
13      A.    Well, in a meeting, no news, it's
14  the day after Christmas, no assignments, so you go
15  out and start your RADAR.
16      Q.    Tell me what RADAR is again.
17      A.    What does that acronym stand for.  I
18  don't know what that acronym stands for, but
19  you're doing your rounds and you have a RADAR,
20  it's a computer based -- it's like that
21  progressive -- you ever seen that
22  progressive, that price tool?
23      Q.    Yeah.
24      A.    That's what it is.  And it has you
25  to, you know, start and it tells you where to

**96**

1  start, where to go, check off whatever is on the
2  RADAR.  You know, it just walks you through your
3  morning checks and services.
4      Q.    Okay.
5      A.    While I was doing that, what was his
6  name, give me a second, supervisor of that day, I
7  can see his face, give me a second.  What is his
8  name.  Anyway, I'll think of his name here in a
9  minute but I'll go on with the story.
10      Q.    Okay.
11      A.    He called me on the phone, on the
12  radio for me to meet him at the steam drum.  I met
13  him at the steam drum, he proceeded to go up a
14  ladder.  I'm on the bottom ramp -- I mean, I'm on
15  the bottom platform, he climbs up the ladder,
16  looks around, give me instructions, mind you, the
17  fin fans is massive, about 12 big fin fans,
18  they're loud, exceedingly loud.  It's cold, you've
19  got your earplugs in, you got your cold muffs on.
20  He gave me a task to -- we're going to -- he said,
21  maintenance come and we're going to isolate a
22  sight glass valve, need you to do a lockout/tagout
23  on it, and he proceeded to tell me to lock out the
24  top valve closed, the bottom valve closed and lock
25  the bleeder open.

**97**

1      You know, he was up there, I was
2  down here.  I mean, I guess he's looking as a
3  supervisor his area, whatever you're looking at,
4  not sure, not sure what he's looking at, but it
5  seemed simple enough, so I wrote down what he told
6  me to do and proceeded on with my RADAR.  After
7  RADAR I had to write a work permit for some
8  electricians in the area working on those fin
9  fans.  Then after I wrote them a permission to
10  work on that, I went in the control room to look
11  up the procedure to do a lockout/tagout on the
12  sight glass valve.  The board foreman, Terry
13  Bauer, told me there was no procedure for that,
14  but just be careful, don't shut me down, just
15  stuff we say.
16      So, you know, I proceeded on with
17  without any paperwork or whatever.  Most things --
18  90 percents of things have a procedure to do step
19  by step.  They don't want you guessing.  They have
20  it already printed out on the computer.  That
21  particular item did not have one and he told me
22  what one and so I went out, got my locks and my
23  tags and proceeded to do the job.  So I climb up
24  that ladder and the top valve of the sight glass
25  was already closed, so I said, hmm, that's where

Gary Turner                                                    10/4/2018

**98**

1   stupid came in.  I said, top valve, this valve
2   down here, he told me top valve, so I closed the
3   top valve thinking I was closing what he told me
4   to close.  And the electricians hollered at me.  I
5   went and seen what they were asking.  At that time
6   the board operator was hollering, Gary, I'm
7   getting an NTE, what did you do?  Whatever you
8   did, undue it.
9        Q.     Is that not to exceed?
10       A.     Not to exceed.  Uh-huh.  So I went
11  back up there, he told me to undo it.  I was
12  turning it back open and that's when the pressure
13  relief valve went off, scared the snot out of me,
14  as you would think.  It's loud and boisterous.  So
15  at that time I'm hollering at the board operator
16  that the -- a relief valve has went off.  So --
17  but what I did is I got the -- what the procedures
18  always tell you, get everybody out of your area
19  and then mitigate the situation.
20             By that time, as I get them to leave
21  the area, my breaker, he comes running up to
22  assist me, he asked me what I had did, and I said,
23  I need to open that valve back, Terry wants me to
24  open that valve back.
25             So I opened the valve, the pressure

**99**

1   went down, it's a matter of 70, 80 seconds, and
2   the pressure relief valve receded and I proceeded
3   on with my lockout/tagout after being ridiculed
4   and felt like a chump or whatever.
5        Q.     So who are the electricians that
6   were hollering at you?
7        A.     The board operator is who was
8   hollering at me.
9        Q.     I thought you said the electricians
10  were too.
11       A.     Hunh-uh.  Well, they asked me for
12  some information.  Not hollering at me.  When we
13  say hollering at me, that's the radio hollering at
14  you, but...
15       Q.     Were they asking you about this
16  incident, this --
17       A.     No, they weren't asking about that,
18  they were working on fin fans.
19       Q.     I got you.
20       A.     They were working on that.
21       Q.     Who was the board operator?
22       A.     Terry Bauer.
23       Q.     Do you know how to spell his last
24  name?
25       A.     B-A-U-E-R, something close.

**100**

1        Q.     Okay.  All right.  You said you went
2   up there and you looked at -- what did you say,
3   the top valve that was already closed?
4        A.     Well, I looked at the sight glass,
5   the sight glass was already closed, but I thought
6   he had told me to close the top valve, you know,
7   locking the top valve.
8        Q.     And that was already blocked in?
9        A.     No, that was open, that's what was
10  open.  The sight glass was already closed.  That's
11  what pretty much confused me.  That was already
12  closed.
13       Q.     So you had confusion at that point
14  about what you were being asked to do?
15       A.     Yes.
16       Q.     Okay.  Instead of asking someone or
17  the gentleman that -- who was the gentleman that
18  told you -- that showed you what he wanted done or
19  told you what he wanted done?
20       A.     That's Dave -- not Dave Rice --
21       Q.     How about Travis Gillum?
22       A.     Travis.  Travis.
23       Q.     So instead of trying to get in touch
24  with Travis because you were confused, you went
25  ahead and went through the procedure, which caused

**101**

1   an NTE; is that right?
2        A.     Yes, sir.
3        Q.     Let me hand you the next exhibit
4   here.
5        (TURNER DEPOSITION EXHIBIT 14 MARKED)
6        Q.     Exhibit 14 to your deposition.  Did
7   you have a meeting on December 26th, the date of
8   this incident, around 2 p.m. with you, a guy named
9   Jeremy Clayborne, Dave Rice and then Katie
10  Scherer?
11       A.     It was after the shift, so it would
12  have been 3 p.m., not 2.
13       Q.     Okay.  Do you recall having this
14  meeting?
15       A.     Yes.  Uh-huh.
16       Q.     Okay.  It looks like on the
17  left-hand side it has initials, DR stands for Dave
18  Rice, I believe, and then GT stands for you; is
19  that right?
20       A.     That's correct.
21       Q.     And this was a meeting with respect
22  -- it's at least entitled an investigation meeting
23  related to the incident you just described on
24  December 26th; is that right?
25       A.     That's correct.

102

```
 1        Q.      Okay.  And your first entry there,
 2  essentially Dave Rice asked you what went on.  And
 3  you said, like you told us, you were doing your
 4  RADAR rounds and Travis came up to you and told --
 5  or contacted you and told you that he wanted you
 6  to, quote, lock out the west side sight glass so
 7  it can be repaired.  That's what you told them,
 8  correct, at this investigation meeting?
 9        A.      Yes.
10        Q.      And then at the end of that you
11  mention in your explanation here what you've just
12  told us about, the electricians working on the fin
13  fans, and then go on to say, quote, then I
14  went to work on the valve and closed the wrong
15  one; correct?
16        A.      Yes, sir.
17        Q.      Okay.  Dave Rice asked you about
18  hearing from the board operator and you said yes.
19  Then you mention that, I evacuated the
20  electricians and then Jeremy came up?
21        A.      That's correct.
22        Q.      Together we relieved the pressure;
23  do you see that?
24        A.      Yes.
25        Q.      How did you evacuate the
```

104

```
 1        Q.      Okay.  A couple of lines down --
 2  well, we'll just go through this line by line.
 3        A.      Sure.
 4        Q.      Maybe not every word, but Dave Rice
 5  asked you which valve did you close and you say
 6  the 90 degree one; correct?
 7        A.      Yes.
 8        Q.      And then Dave Rice asked you did you
 9  know your job was to isolate the sight glass, did
10  you know the 8-inch valve was not the sight glass,
11  and your response to that question was, I do, I
12  just didn't process it at first.  I didn't go up
13  and look at it when Travis was explaining it to me
14  and I should have.  Is that what you told Dave
15  Rice during the investigation meeting?
16        A.      Yes.
17        Q.      And you were trying to be honest
18  with him during this investigation meeting; right?
19        A.      Of course.
20        Q.      I mean, you weren't going to lie
21  about what happened or lie about what you did,
22  right, you wanted to be 100 percent honest?
23        A.      Absolutely.
24        Q.      Then Dave Rice says, do you
25  understand the reason why that was not the
```

103

```
 1  electricians?
 2        A.      Just told them to get out of the
 3  area.
 4        Q.      Okay.  Were they out of the area by
 5  the time this thing was over?
 6        A.      Yes.  They left immediately.
 7        Q.      Okay.  What did you and Jeremy do to
 8  relieve the pressure?
 9        A.      Well, I had already started opening
10  it and when the pressure relief valve come up, you
11  know, startled me, loud noise, so I got -- I'm
12  hollering at the board man that a pressure relief
13  valve has been set off.
14              And, you know, you can hardly hear,
15  fin fans and this now other noise, so what I did
16  was what we're trained to do, get people out of
17  there, if anybody is in your area, get them out of
18  the area.  And then he was already telling me --
19  he had already told me to undo what I did, so I
20  was starting that process when the relieve valve
21  went off, so after I got them out there, I went
22  right back up there five, ten seconds because, you
23  know, they were aware of something wrong, also, so
24  they were more than willing to leave, so just a
25  matter of seconds.
```

105

```
 1  appropriate valve to close, and you said, yes, I
 2  don't know why I did it, confused me when I saw
 3  the 8-inch valve was at 100 pounds versus its
 4  normal 450 pounds, and I think Jeremy Clayborne
 5  says, the gauge is broken and that can give the
 6  appearance that it's closed?
 7        A.      Right.
 8        Q.      Okay.  So I want to understand, you
 9  were confused about what you needed to do.  And I
10  think you mentioned this earlier, instead of
11  asking a question to someone to make sure you were
12  doing the right thing, you just went ahead and
13  did -- went on about the process being confused;
14  is that right?
15        A.      I wouldn't phrase it the way you
16  were phrasing it, no.
17        Q.      So you were clear on what you were
18  supposed to do, you were just wrong?
19        A.      Well, clear on whether -- exactly,
20  just wrong.
21        Q.      Okay.  So when you say, it confused
22  me, that wasn't accurate?  I don't know why I did
23  it, confused me.  You were confused; right?  It's
24  okay to be confused.
25        A.      Well, what confused me was the
```

**106**

1  gauge.  You're looking at -- this gauge is in its
2  valves.
3        Q.      Right.
4        A.      Well, it's 450 pounds steam room.
5  If the -- now, I didn't process all this at that
6  point, but if they were going to work on it I was
7  wondering why it wasn't at 450 to start with.
8  That's the normal operating pressure of that
9  vessel.  It was the gauge was broke, I assumed it
10  needed all the way closed because this one was
11  closed, the sight glass valve was closed, so...
12        Q.      And you mentioned earlier on in this
13  investigation meeting that Travis told you to lock
14  out the west side sight glass so it could be
15  repaired; right?
16        A.      Yes.
17        Q.      And in that instance that we just
18  read about, yes, I don't know why I did it,
19  confused me, I just want to understand, you were
20  confused about what you were supposed to do at
21  that point?
22        A.      That's correct.
23        Q.      Okay.  Then at the bottom of that --
24  at the bottom of that page in response to a
25  question by Katie Scherer, she asked, did Travis

**107**

1  instruct you to close the 8-inch valve, you say,
2  he told me to close valves, not necessarily that
3  valve.  I know Travis wouldn't steer me wrong, it
4  was my mistake.  Let's see, I wrote it in my
5  notebook, and then it indicates you pulled out
6  your notebook and read from it, quote -- this was
7  a quote from your notebook, I believe, steam drum
8  lockout, top close, bottom close, block open
9  bleeder, end quote.  I was on the ground when he
10  was explaining it, so I missaw what he was
11  explaining.  Did I read that correctly?
12        A.      That's correct.
13        Q.      I can't find where you produced the
14  notes that you took.  Do you still have those?
15        A.      I don't know if I do or not just
16  here.
17        Q.      Right.  And you may not have them,
18  that's fine.  I didn't know if you kept those
19  notes or not.  You may not have.
20        A.      Right now I don't know.  If I was to
21  dig, dig, dig, if it's there, it's there, but I
22  don't know if I still have that notebook.
23        Q.      Okay.
24        A.      I used that notebook for everything
25  A to Z, the notebook.

**108**

1        Q.      I got you.  If you turn on to the
2  next page, the third line in on that page, that's
3  DR for David Rice again; right?
4        A.      Uh-huh.
5        Q.      It says, DR says, anything we could
6  do trainingwise to prevent this, and you
7  responded, not really, I just need to take time to
8  think about things or go up and look when it's
9  being explained; is that correct?
10        A.      That's correct.
11        Q.      Okay.  And, again, you're just
12  trying to be honest with them about what went on;
13  right?
14        A.      That's correct.
15        Q.      In the middle of that page David
16  Rice -- let me ask you this, was there -- at this
17  meeting do you remember there being like an
18  example of an 8-inch valve or anything like that
19  being present?
20        A.      No.
21        Q.      Do you know what it means to draw
22  out drums and valves in question?  Do you know
23  what that means in the middle of the page there
24  under DR?
25        A.      No.  It says draws out.

**109**

1        Q.      Drums and valves in --
2        A.      Oh, Dave draws out.  Yeah, Dave
3  draws out.  Yeah.
4        Q.      Yes.
5        A.      Yeah.
6        Q.      Okay.  And it says, I just want
7  to -- Dave Rice says, I just want to understand
8  the disconnect because opening an 8-inch valve
9  should be a big red flag, and you respond, quote,
10  it is 100 percent an eye opening and learning
11  experience.  And then he said -- Dave Rice says,
12  and you thought the 8-inch valve was right, and
13  you responded, was under that impression at the
14  time, was a learning experience (sic).  Did I read
15  that correctly?
16        A.      That's correct.
17        Q.      Then Dave Rice says, I do want to
18  make sure you understand the severity of the
19  situation.  We did hit an NTE, which means
20  exceed -- exceeded the rated pressure.  We were on
21  the verge of an equipment failure, if not other
22  severe things.  Did I read that correctly?
23        A.      That's correct.
24        Q.      And then your response to that was,
25  I was not being negligent, just made a mistake.  I

---

**110**

1 understand the severity.  Did I read that
2 correctly?
3          A.        That's correct.
4          Q.        You said you understand the
5 severity.  What was the severity of this incident
6 that you understood you were trying to convey to
7 Mr. Rice and Mr. Scherer -- Mrs. Scherer during
8 this meeting?
9          A.        I was just conveying that I
10 understand the severity of the incident that just
11 happened and how to SLAM it.  SLAM is an acronym,
12 stop, look, analyze, mitigate.
13          Q.        SLAM, that's a good one.  Stop,
14 look --
15          A.        Analyze and mitigate.
16          Q.        -- analyze and mitigate.  And in
17 your mind when you say you understand the
18 severity, what did you mean?  What was the
19 severity of this incident on December 26th, 2012?
20          A.        Closing that wrong valve, it stopped
21 the flow of steam from going through the process,
22 which the process without steam can fail.
23          Q.        Why is that -- why is that --
24          A.        Heat.
25          Q.        -- a problem?

---

**111**

1          A.        Heat.
2          Q.        And what do you mean?  What does
3 heat do?
4          A.        Heat is what heats the --
5          Q.        Does it -- if it -- if a -- if the
6 flow of steam stopped, you're saying the heat
7 could rise?
8          A.        Well, let me try to explain.
9          Q.        Okay.
10          A.        Has two sources of heat, it has gas
11 heat, fuel gas heat, and steam is a supplemental
12 heat, they don't waste anything, so the steam drum
13 goes through those heaters, water goes through
14 those pipes inside the heaters to capture heat,
15 more heat.
16          Q.        Okay.
17          A.        And they just don't waste anything.
18          Q.        Okay.  And, again, I'm just trying
19 to understand -- you said you understood the
20 severity, I'm trying to understand what the
21 severity is.  If it's a severe instance, you
22 understand the severity.  Tell me what the
23 severity was that you understood.
24          A.        The severity of what I did, the
25 mistake I did, I understood what it could do if --

---

**112**

1          Q.        Okay.  There you go, stop right
2 there.
3          A.        Okay.
4          Q.        What could it do?
5          A.        What could it do?  Affect the
6 process.  You could --
7          Q.        How --
8          A.        -- shut down.
9          Q.        How could it affect the process?
10 You said you could have a shutdown?
11          A.        Yeah.  Well, shut down of the unit,
12 you're going to stop the unit.  It's not going to
13 blow up or anything without that instance.  You're
14 just going to -- you're going to lose 8 hours,
15 10 hours, 12 hours, whatever, you know, money.
16          Q.        Paid 8 hours, 10 hours, 12 hours of
17 the unit itself?
18          A.        It could be one, but a loss is a
19 loss.
20          Q.        Right.  Okay.  So your understanding
21 of the severity was it was a monetary loss, it
22 could be a monetary loss, that was your
23 understanding of the severity?
24          A.        My understanding of the severity is
25 me doing that -- making that mistake to cause the

---

**113**

1 company to, that's my severity of it, you know, my
2 part.
3          Q.        Right.  And I'm just -- again, I'm
4 not -- I'm not trying to fight with you or
5 anything, I'm just trying to understand the
6 severity.  The severity that you understood was
7 that you could have caused a monetary loss to
8 Marathon had the unit had to be shut down?
9          A.        Sure.
10          Q.        That was the only severity that you
11 recognized out of that entire incident?
12          A.        The word severity, and I'm just
13 saying what the severity I felt.  I felt I made a
14 mistake, I'm owning up to my mistake.
15          Q.        Right.
16          A.        He's asking me do I understand my
17 mistake and I told him I understood the severity
18 of it.  I think he said the word first; right?
19          Q.        Yeah.
20          A.        I do not want to make -- I want to
21 make sure you understand the severity.  I
22 reiterated I understand the severity.  Whatever he
23 meant I meant.
24          Q.        What did he mean then?
25          A.        Just like explaining it, the

---

Gary Turner                                                                10/4/2018

### 114

1  severity, what could happen, do you understand
2  that, you know.
3       Q.    Right.  But you said --
4       A.    She didn't write down every word
5  we -- oh, excuse me.  She didn't write down every
6  word we're saying in this meeting.  I guess this
7  is a general synopsis of -- you know.
8       Q.    Okay.  You said -- he used the word
9  severity first and you meant what he meant, so I'm
10  trying to understand what you thought he meant.
11      A.    Severity.
12      Q.    Yeah.  Let me give you an example so
13  I can try to understand or ask a better question
14  and give you an example of what I mean.  If I go
15  out and drive drunk one night, okay, I understand
16  the severity of that because it's against the law,
17  I could hit somebody else and kill them, I could
18  have a wreck and kill myself.  There's a lot of
19  things that could happen because of that decision
20  I made; right?
21      A.    Yes, sir.
22      Q.    If I walk across the street without
23  looking, I understand the severity of that because
24  I could get hit by a car and killed; right?
25  Right?  So I understand the severities.  Those are

### 115

1  different severities; right?  One of them is
2  affecting me, one is I could potentially affect
3  other people's lives.  And what I'm asking is, the
4  severity that you understood and the severity that
5  you've expressed to me today is that it could be a
6  monetary loss to Marathon if they had to shut down
7  that unit.  Did you recognize any other severity
8  other than a monetary loss to Marathon that could
9  result from that incident?
10      A.    Being in training and being all
11  those things you just went over, you are honed in
12  on -- there's three things down there that can
13  happen, it can expose, pollute or explode.  The
14  severity of either one of those happening is not a
15  good scenario.  So he was using a word that is
16  used within Marathon terminology, he used the word
17  severity, I understood the severity as it is
18  encompassed with anything that could happen.
19      Q.    So it's not only shut down the unit
20  but potential explosion, potential pollution,
21  those types of things are encompassed in the word
22  severity?
23      A.    I would say so.
24      Q.    Okay.  You said that Katie or
25  whoever typed this up was just writing down a

### 116

1  general synopsis, not every word you said?
2       A.    Yes, she wasn't typing --
3       Q.    What do you recall about that?
4  We've gone through the entire thing now.  What do
5  you recall at that meeting that's not written down
6  in this document?
7       A.    I don't recall nothing that was said
8  that isn't written, but we were there longer than
9  these two pages of notes.
10      Q.    So you don't recall anything that
11  was said that's not in writing here but it may --
12  you were there longer and more was said; right?
13      A.    A lot more said, yes.
14      Q.    Okay.  But you don't recall what
15  more was said?
16      A.    No.
17      Q.    Okay.
18      A.    No, sir.
19      Q.    All right.
20           MR. DOVE:  Can we take a break?
21           MR. HORNBACK:  Yeah.  Yeah.
22      (RECESS; MR. BARNETT REPLACES MR. DOVE)
23      Q.    One more question about -- it's not
24  really about the meeting notes, it's more about
25  the incident itself on December 26th.  The sight

### 117

1  glass that you were supposed to lock out, there
2  was a valve associated with it; right?
3       A.    Two valves.
4       Q.    Two valves.  One --
5       A.    Input and -- output and input.
6       Q.    Right.  One of them was a
7  one-and-a-half-inch valve; right?
8       A.    Sizewise I don't know, but that's
9  one and a half, two at the most.
10      Q.    And then the other one that you
11  actually closed was an 8-inch; is that right?
12      A.    Yes.
13      Q.    Okay.  And there was a noticeable
14  size difference between the two valves; right?
15      A.    Yes.
16      Q.    Okay.  And I think you mentioned
17  that you closed the steam valve which caused the
18  problem?
19      A.    Steam drum valve, yes, to stop the
20  flow.
21      Q.    Steam drum.  Are those generally
22  larger valves?  I mean, you know, the 8-inch valve
23  there and the other one was 1 and a half.  Are
24  steam valve -- drum valves or steam valves, are
25  those generally larger in size?

118

1           MR. BARNETT:  Object to the form.
2   Larger than what?
3       Q.      Than the other valves?
4       A.      Repeat that one more time.
5       Q.      Yeah.  Are steam drum valves larger
6   than other valves at the facility?
7       A.      It's not really a steam drum valve,
8   it's -- valves are different sizes throughout the
9   facility, from 12, even bigger than one-half.
10  It's no certain valve for steam, drum is...
11      Q.      Okay.  That's -- I appreciate that.
12  I asked a bad question.  That's what I was trying
13  to get at.  Now, you were ultimately terminated
14  related to this December 26th, 2012 incident; is
15  that right?
16      A.      Yes.
17      Q.      Your last day at Marathon was, I
18  believe, January 3rd, 2013; does that sound about
19  right?
20      A.      That's correct.
21      Q.      So you worked at Marathon from
22  August 2012 to January 3rd, 2013; is that
23  accurate?
24      A.      Yes.
25      Q.      About five months, right around five

119

1   months?
2       A.      Yes.
3       Q.      Okay.  Hand you the next document.
4       (TURNER DEPOSITION EXHIBIT 15 MARKED)
5       Q.      And again, Mr. Turner, these are
6   some documents that you produced in this case.
7   This is the EEOC intake questionnaire that you
8   filled out with respect to a charge with the EEOC;
9   is that accurate?
10      A.      That's correct.
11      Q.      And you were -- submitted the charge
12  to the EEOC that you were discriminated against
13  based upon your race; is that accurate?
14      A.      That's correct.
15      Q.      Down at the bottom -- I'm not going
16  to go through all of this, okay, but I'll try to
17  direct to you where I'm looking.  Down at the
18  bottom it says your employment data.  Do you see
19  that?  No. 3?
20      A.      Oh, yes.  Uh-huh.
21      Q.      Okay.  And this is your handwriting
22  on this document?
23      A.      Yes, sir.
24      Q.      And it lists your immediate
25  supervisor as Dave Rice, the team leader; is that

120

1   right?
2       A.      Yes.
3       Q.      Okay.  And then you also list your
4   current pay of 33.46; is that right?
5       A.      Yes.
6       Q.      If you turn over to the next page,
7   and this is for the record PLA 35, page I'm
8   looking at now, it says on January 3rd right in
9   the middle, No. 5, where you've written down
10  January 3rd, 2013; do you see that?
11      A.      Uh-huh.  Yes.
12      Q.      I was discharged by Gerald
13  Naliborski, operations manager; is that right?
14      A.      Yes.
15      Q.      And then it says, based on my
16  erroneously blocking in a discharge valve on a
17  steam drum, and then there's some words, in my,
18  and I can't read the rest of that.
19      A.      Area.
20      Q.      In your area.  Okay.  And that
21  was -- was that the reason that Mr. Naliborski
22  gave you?
23      A.      Yes.
24      Q.      Okay.  Down at the bottom of the
25  page you have -- essentially you were asked other

121

1   people that were treated better than you; right?
2   And you list Justin Turner, Nick Warnock, Jordan
3   Daniel and Billy Cristy; is that right?
4       A.      Yes.
5       Q.      Okay.  And we'll talk about them in
6   just a minute.  I had a question.  Billy Cristy,
7   it says he was fired.
8       Q.      Let's just go through these guys
9   right here for just a second.  Do you know Justin
10  Turner personally?
11      A.      No, sir.
12      Q.      Was Justin Turner employed at
13  Marathon when you were employed at Marathon?
14      A.      Yes, he was.
15      Q.      Did you work with Justin Turner?
16      A.      No.
17      Q.      Where did Justin Turner work, if you
18  know?
19      A.      In the new north area.
20      Q.      New north?
21      A.      Which area -- I mean, which unit he
22  was on, I don't know, but he was in the new north,
23  me in the south.
24      Q.      Okay.  So he was in a different part

122

```
1   of the facility?
2        A.      The plant, yes, sir.
3        Q.      Okay.  Do you know what his job was?
4        A.      Utility operator.
5        Q.      Did he work on different types of
6   equipment in that different area of the plant as
7   opposed to what you would be working on in your
8   area of the plant or were they the same?
9        A.      Each unit has different
10  characteristics as far as equipment, but a lot of
11  it is the same.
12       Q.      Do you know who his supervisors are
13  or were?
14       A.      No.
15       Q.      Nick Warnock, did you -- do you know
16  Nick Warnock individually?
17       A.      Yes, I do.
18       Q.      Okay.  Did you work with Nick
19  Warnock when you were at Marathon?
20       A.      He trained with us.  That's the one
21  I spoke of had to do retraining.
22       Q.      You said earlier you didn't know
23  what he did exactly but he had to go through
24  training?
25       A.      Right.
```

123

```
1        Q.      Do you know who his supervisors
2   were?
3        A.      It would be all the same of mine.
4   We were in the same area.
5        Q.      Got you.  Do you know who his
6   supervisor was when he -- when he was first
7   employed and had to go through retraining?
8        A.      No.
9        Q.      You don't know who that supervisor
10  was?
11       A.      No, sir.
12       Q.      What about Jordan Daniel, do you
13  know Jordan Daniel individually?
14       A.      No, sir.
15       Q.      Do you know what area of the
16  facility he worked at?
17       A.      He worked in our area.  I ain't for
18  sure if he was on the guard case or Cumene, but
19  all that's the south end, but I don't know
20  exactly, no.
21       Q.      What was his job title, if you know?
22       A.      Utility operator.
23       Q.      Okay.  Do you know what he did wrong
24  here?  You say he was treated differently.  Do you
25  know what he did?
```

124

```
1        A.      The mistake that he made was failure
2   to -- I don't know specifically, so I'm not going
3   to go on the record and say specifically but he
4   caused injury to other employees.
5        Q.      Caused injury to other employees?
6        A.      Yes, maybe employee, not employees.
7        Q.      Okay.  How do you know that?  Were
8   you told that by somebody?
9        A.      Yes, I was.
10       Q.      Who were you told that by?
11       A.      Ernest Fitzpatrick.
12       Q.      Mr. Justin Turner, you said you
13  don't really know what he did -- or what did
14  Justin Turner do differently?
15       A.      He left open a bleeder valve that
16  caused a vapor cloud to go through the plant that
17  caused the Whalen sound to be signaled for rescue
18  and all other aspects of operation to come to
19  immediate attention and it lasted five minutes.
20       Q.      Okay.  Were you there at the plant
21  when that happened?
22       A.      No, sir.
23       Q.      How do you know about that incident?
24       A.      Ernest Fitzpatrick also.
25       Q.      And then Ernest -- did Ernest tell
```

125

```
1   you about the Nick Warnock -- or you knew Nick
2   Warnock because he told you he had to go through
3   retraining again?
4        A.      I knew him, but Ernest -- Ernie --
5   he'd kill me if I called him Ernest.  Ernie
6   advised me of him also.
7        Q.      Okay.  Ernie -- Ernest told you
8   about Jordan Daniel?
9        A.      Yes.
10       Q.      Do you know who Jordan Daniel's
11  supervisor was at the time of this mistake --
12       A.      No.
13       Q.      -- that you reference?  Do you know
14  what part of the plant it occurred in?
15       A.      South end.
16       Q.      Is that where you were?
17       A.      Yes.
18       Q.      What about Billy Cristy, do you know
19  Billy Cristy individually?
20       A.      No, sir.
21       Q.      Or personally, excuse me.  It says
22  here he was fired.  Do you know why he was fired?
23       A.      Getting caught sleeping for the
24  second time.
25            MR. BARNETT:  I'm sorry, I couldn't
```

## 126

1   hear that.
2       Q.      Sleeping.
3       A.      Getting caught sleeping for the
4   second time.
5       Q.      Did you see that personally?
6       A.      No.
7       Q.      Okay.  Who told you that?
8       A.      Ernest Fitzpatrick.
9       Q.      Do you know when this occurred?
10      A.      It was after I left shortly,
11  February, no later than March of '13.
12      Q.      Okay.  Did you ever work with Billy
13  Cristy when you were at Marathon?
14      A.      No.
15      Q.      Okay.  Was he on a different crew or
16  something?
17      A.      He was on a class behind us, our
18  hiring class.
19      Q.      Oh, hiring, okay.  He was in a
20  hiring class behind you?
21      A.      Behind us, yes.
22      Q.      I got you.  Do you know who his
23  supervisor was?
24      A.      They would have been all the same
25  supervisors in that area.

## 127

1       Q.      Was it Dave Rice's supervisor or
2   was --
3       A.      Dave Rice is the team leader.  He's
4   over supervisors.  Team leader is over
5   supervisors.
6       Q.      Got you.  Okay.  All right.  I want
7   to flip forward here to PLA 38.  And this is a
8   typed-out -- your typed-out answers to different
9   questions that were part of your EEOC filing; is
10  that accurate?
11      A.      That's correct.
12      Q.      Okay.  I want to ask you a couple of
13  questions and, again, I'm not going through all of
14  this, but if you are on PLA 38, the second
15  paragraph from the bottom where it starts out
16  Gerald stated; do you see that?
17      A.      From the bottom of 38?
18      Q.      PLA 38, two paragraphs up.
19      A.      Gerald stated.  Gerald -- two
20  paragraphs --
21      Q.      Are you on the right?
22              MR. BARNETT:  38-1.
23      Q.      Yeah, 38.  I'm sorry.
24      A.      All right.  We're there.
25      Q.      Okay.  Gerald stated.  Do you see

## 128

1   that?
2       A.      Uh-huh.  Yes.
3       Q.      And here you're referring to
4   Mr. Naliborski?
5       A.      Yes.
6       Q.      Is that right?
7       A.      Yes.
8       Q.      It says, Gerald stated they were
9   discharging me due to my prior serious performance
10  issues, safety concerns and that his phrase was
11  either I didn't look like an oil refinery operator
12  or I didn't look comfortable as a refinery
13  operator, which I am not aware of any prior
14  serious performance issues, nor was I ever
15  informed of any safety concerns on my part.  Do
16  you see if that -- did I read that correctly?  You
17  go on to say other things but...
18      A.      Yes.  Pardon me?  Oh, yes.
19      Q.      And so did Mr. Naliborski either say
20  I didn't -- you didn't look like a refinery
21  operator or you didn't look comfortable as a
22  refinery operator; correct?
23      A.      Correct.
24      Q.      And you don't know which one he said
25  because you said he said either the first one or

## 129

1   the second one, you're just not sure; right?
2       A.      That would be right.
3       Q.      Okay.  Then in the bottom paragraph
4   there, I want to move on to there if you'd allow
5   me.  You say, he, Gerald, then stated everybody is
6   good at something and that I was probably -- that
7   I probably was good at being a fireman or a
8   military man but that he didn't want me hurting
9   co-workers nor myself because this industry is
10  dangerous and that he'd rather discharge me rather
11  than for him to have to tell my family or my
12  co-workers' family that I've caused theirs or my
13  own injury or death.  Did I read that correctly?
14      A.      Yes, you did.
15      Q.      And I'm assuming since these are
16  your own words, that's accurate with what you
17  recall Mr. Naliborski said?
18      A.      That's exactly accurate.
19      Q.      And then you say, then he asked me
20  did I have anything to say, comma, I reiterated
21  that I made a mistake and closed the wrong valve.
22  Did I read that correctly?
23      A.      Yes.
24      Q.      And you didn't think your
25  termination was justified; is that right?

Gary Turner                                                                    10/4/2018

---

130

1   A.      You mean as far as saying or is
2  that -- are you talking about did I think that?
3   Q.      You thought that.  I mean, you put
4  that in this letter and you thought that to be
5  true today; right?  You don't think your
6  termination was justified based on that mistake?
7   A.      I don't see where I said I don't
8  think my termination was justified.
9   Q.      Well, okay.  You say, then he asked
10 me did I have anything to say.  I reiterated that
11 I made a mistake and closed the wrong valve;
12 however.  I stated that I know I could do this job
13 and that I didn't think the termination was fair
14 or justified.
15  A.      Okay.  I see it.  I see it.
16  Q.      That's what you thought then and
17 that's what you think today?
18  A.      Yes.  Yes.
19  Q.      Ernest Fitzpatrick, what -- you
20 mentioned him earlier and we talked about him a
21 little bit.  Do you remember what his job title
22 was at -- I think you said it was a number one
23 operator; is that what it is?
24  A.      Yes.
25  Q.      Are there different levels of

---

131

1  operators at Marathon?
2   A.      The more seniority you have you
3  develop what's -- you have a crew.
4   Q.      Okay.  Was Ernest involved in a crew
5  or head of a crew?
6   A.      He had a crew, yeah.  They had a
7  crew.
8   Q.      And where does Ernest live?
9   A.      In Huntington.
10  Q.      In Huntington.  Do you know his
11 address?
12  A.      Yes, I do.
13  Q.      Okay.  What is that?
14  A.      1738 Doulton Avenue.
15  Q.      D-A-L-T-O-N?
16  A.      Doulton, D-O-U-L-T-O-N.
17  Q.      Okay.  And that's in Huntington?
18  A.      Yes, sir.
19  Q.      All right.  I show you the next
20 exhibit here.
21      (TURNER DEPOSITION EXHIBIT 16 MARKED)
22  Q.      Mr. Turner, if you will take a look
23 at this document.  This is the complaint that was
24 filed on your behalf against Marathon originally
25 in the Boyd Circuit Court here in Kentucky.  Have

---

132

1  you seen this document before?
2   A.      Yes, I have.
3   Q.      Okay.  Did you review it before it
4  was filed?
5   A.      No.
6   Q.      Okay.  But you reviewed it since it
7  was filed?
8   A.      Yes.
9   Q.      And do you believe the allegations
10 contained in it are true to the best of your
11 knowledge and understanding?
12  A.      There is typos, but other than that,
13 it's relevant to what it is.
14  Q.      Do you know what the typos are just
15 so I can make sure I note them?
16  A.      Maybe No. 8, the plaintiff had not
17 been trained on procedure of locking valves, that
18 might have -- may have -- could have said the
19 plaintiff had not been trained on locking like a
20 hot work or -- of valves on -- let's see, that
21 wouldn't be he hadn't been trained, you know,
22 because we've seen where -- let me see what else.
23  Q.      And let's just stay on that one for
24 a second.  You're saying you had been trained
25 on -- we went through all those training logs --

---

133

1  trained on locking valves; right?
2   A.      Right.
3   Q.      Go ahead.  I'm sorry, I didn't mean
4  to interrupt you.
5   A.      That may be the only one seriouser
6  (sic) ones that...
7   Q.      Yeah.  So the rest -- you just
8  looked at it, the rest of this complaint is
9  accurate?
10  A.      Yes.  Yes.
11  Q.      Okay.  That's all I wanted to make
12 sure.  All right.  You can put that one away.  I'm
13 going to hand you the next exhibit here, see if we
14 can't get a little more information.
15      (TURNER DEPOSITION EXHIBIT 17 MARKED)
16      MR. BARNETT:  17?
17      MR. HORNBACK:  Correct.
18  Q.      Mr. Turner, these are the initial
19 disclosures that were filed on your behalf by your
20 counsel in this lawsuit.  Did you have an
21 opportunity to look at these before they were
22 filed?
23  A.      Pretty much, yes.
24  Q.      Okay.  You list potential witnesses
25 and then potential exhibits in the case and I

---

EXHIBIT 1

---

**134**

1   wanted to go through the witnesses with you a
2   little bit. We've discussed Dave Rice. That was
3   your team leader; is that right?
4       A.      Yes, sir.
5       Q.      Gerald Naliborski, that was the --
6   you list him here as the operations manager; is
7   that right?
8       A.      That's correct.
9       Q.      Mr. Naliborski, was he above
10  Mr. Rice on the pecking order?
11      A.      He's operations manager, he's over
12  the plant operationswise.
13      Q.      Okay. Justin Turner we talked about
14  a little bit earlier; right?
15      A.      Yes.
16      Q.      Nick Warnock we talked about --
17      A.      Yes.
18      Q.      -- I think earlier?
19      A.      Yes.
20      Q.      Jordan Daniel, another individual we
21  talked about?
22      A.      Yes, we do.
23      Q.      Terry Bavers, who is --
24      A.      That's improperly -- incorrectly
25  spelled. It's Terry Bauer, B-A-U-E-R.

---

**135**

1       Q.      B-A-U-E-R, Terry Bauer.
2       A.      He was the board operator the day of
3   the incident.
4       Q.      Okay. He was the board operator?
5       A.      Yes, sir.
6       Q.      Does he go by Joe?
7       A.      That's his brother.
8       Q.      Okay. Joe is his brother?
9       A.      Yes.
10      Q.      What -- how was Terry Bauer -- and
11  maybe I -- I missed this. He was the board
12  operator the day that you were --
13      A.      The incident, December 26th.
14      Q.      Of the incident. You list him here
15  as a white co-worker who was treated differently
16  than you.
17      A.      Actually, that would be a typo.
18  That's where that Joe Bauer should be.
19      Q.      Okay. Joe Bauer. Okay. What
20  was -- do you know what Joe Bauers did that was --
21      A.      To my understanding, a few negligent
22  things. He was older, 30-year man, but verbatim,
23  no.
24      Q.      Okay. That would be something --
25  who told you about him?

---

**136**

1       A.      Ernie Fitzpatrick.
2       Q.      He had -- Joe Bauers had been there
3   for 30 years; is that what you said?
4       A.      Give or take, yes.
5       Q.      You don't know precisely what he
6   did, that was just something Ernie -- Ernest must
7   have told you?
8       A.      It's in documentation somewhere,
9   but, yes.
10      Q.      You don't have any personal
11  knowledge of that?
12      A.      No. No.
13      Q.      What about Jeff Davis?
14      A.      I don't know who Jeff Davis is or
15  how his name -- Marathon sent him to the EEOC --
16  his name to the EEOC and I don't know why his name
17  was in that at all.
18      Q.      Not somebody that you're relying on,
19  that was just something that you learned from
20  Marathon?
21      A.      Yes.
22      Q.      Okay. Do you know what Mr. Davis
23  did?
24      A.      No.
25      Q.      And that's not something that Ernie

---

**137**

1   Fitzpatrick told you?
2       A.      No.
3       Q.      And you don't have any personal
4   knowledge of what Mr. Davis did?
5       A.      No.
6       Q.      In fact, you don't have any personal
7   knowledge of what Mr. Turner, Mr. Warnock or
8   Mr. Daniel did, those are things that someone else
9   told you; right?
10      A.      There's documentation in the EEOC
11  file of their stuff.
12      Q.      Okay. But that's not something you
13  have personal knowledge of?
14      A.      Personal knowledge, no, sir.
15      Q.      Okay. You can put that one away.
16  We're getting closer, I promise.
17              (OFF THE RECORD)
18          (TURNER DEPOSITION EXHIBIT 18 MARKED)
19      Q.      If you can take a look at these,
20  these are your responses to interrogatories and
21  also your responses to request for production of
22  documents in this case. Did you have an
23  opportunity to look at these before they were sent
24  over to us?
25      A.      Sure did.

---

Gary Turner                                                10/4/2018

**138**

1  Q.     Okay.  And I'm presuming that the
2  information contained in these is accurate to the
3  best of your knowledge and belief?
4  A.     Yes.
5  Q.     Okay.  We can go through some of
6  these.  I think we've talked about several of
7  them.  You talk about people that were essentially
8  treated different than you -- that you believe
9  were treated different than you, Justin Turner,
10 Nick Warnock, Billy Crystal?
11 A.     Singer, Cristy.
12 Q.     Oh, I'm sorry, yeah.  Sorry.  Billy
13 Cristy, Jordan Daniel.  And we've talked about
14 those folks previously; right?
15 A.     Yes, sir.
16 Q.     And then Interrogatory 3 asks
17 individuals you intend to call as witnesses at
18 trial.  You mention yourself, you mention Ernie
19 Fitzpatrick; correct?
20 A.     Yes.
21 Q.     Okay.  And Ernie I think you told us
22 is an African-American male; is that right?
23 A.     That's correct.
24 Q.     And he worked at Marathon for about
25 35 years?

**139**

1  A.     That's correct.
2  Q.     And he retired from there, I
3  think --
4  A.     December 13 --
5  Q.     December 13th?  Okay.
6  A.     -- is when he retired, yeah.
7  Q.     Jeremy Clayborne, who is that?
8  A.     He's -- he was the first one on the
9  scene of the incident.  He was the breaker that
10 day.
11 Q.     What was his -- what was his
12 position at Marathon at that time?
13 A.     He was utility operator also.
14 Q.     Okay.  And tell me again what he did
15 during the incident on December 26th, physically
16 what he did.
17 A.     He just came up to assist our area.
18 That's pretty much his job as a breaker, know all
19 the jobs in the -- all three jobs.  He just came
20 up to assist me to mitigate the situation at hand.
21 Q.     What did he physically do when he
22 was there?
23 A.     Nothing.
24 Q.     Okay.
25 A.     Nothing physically.  Only one valve,

**140**

1  I turned it.
2  Q.     Okay.  Robert Barney Woodard?
3  A.     Yes.
4  Q.     Who is that?
5  A.     That's African-American male that
6  works at the plant.
7  Q.     Do you know his -- what his position
8  is?
9  A.     Also utility operator.
10 Q.     Do you know him personally?
11 A.     Not personally know him, yes.
12 Q.     Have you ever talked to him?
13 A.     No.  What do you mean ever?
14 Q.     Did you talk to him while you were
15 working at Marathon?
16 A.     Yes.
17 Q.     Okay.  Were you-all friends or just
18 see each other and say hi in the morning or what?
19 A.     He's a cousin of my wife's -- he's a
20 cousin of my wife's first cousin that works there
21 also.  That's how I know him.
22 Q.     Who's the cousin of the wife's -- or
23 who's the -- your wife's first cousin that works
24 there?
25 A.     Jay Johnson is a day foreman, his

**141**

1  wife and my wife are first cousins.
2  Q.     Okay.  So Jay Johnson works at
3  Marathon?
4  A.     Yes, he's a supervisor at Marathon.
5  Q.     What's his race?
6  A.     African-American.
7  Q.     Okay.  And he's a supervisor?
8  A.     Called a day foreman, but
9  supervisor.
10 Q.     A day foreman.  How long has he been
11 working at Marathon?
12 A.     20 plus.  I don't know the exact
13 dates -- I mean, years.
14 Q.     And you say he's a supervisor and
15 this again goes to my ignorance on exactly how it
16 works out there.
17 A.     Don't feel rained on.  They got
18 supervisors, they got shift foremans, they got day
19 foreman, then they got team leaders, then they've
20 got...
21 Q.     Is he a supervisor over utility
22 worker -- operators?
23 A.     Yes, he's a supervisor over the
24 No. 3 or No. 5 crew, an area.  Just like PCR is an
25 area, he has an area also.

142

```
1   Q.       And so his ultimate boss would be
2   Dave Rice; is that right?
3   A.       Yes, because he's in our area, so
4   Dave is his boss, team leader.
5   Q.       Right.  And then his ultimate,
6   ultimate boss would be Gerald Naliborski --
7   Naliborski?
8   A.       Naliborski.
9   Q.       And that would have been the same
10  for Ernest Fitzpatrick too; right?
11  A.       What would be the same?
12  Q.       Would his one up supervisor be Dave
13  Rice before he retired -- before Mr. --
14  A.       Supervisor, no.  Dave is a team
15  leader.  Dave is in charge of supervisors.
16  Q.       Would Ernest Fitzpatrick -- would
17  Dave Rice be over Ernest Fitzpatrick?
18  A.       Oh, yes.
19  Q.       And then so ultimately Gerald
20  Naliborski would have been over Mr. Fitzpatrick as
21  well?
22  A.       He's over the plants.
23  Q.       Got you.  And you say that Mr.
24  Woodard, African-American male, was -- he
25  committed some employment violations but was
```

143

```
1   retained; right?
2   A.       According to Marathon.
3   Q.       Well, was he working there when you
4   were there?
5   A.       Yes.
6   Q.       Do you know if he still works there
7   today?
8   A.       Yes, he do.
9   Q.       So you're not saying that's wrong, I
10  mean --
11  A.       Saying what's wrong?
12  Q.       You're saying that he committed
13  employment violations but was retained?
14  A.       According to Marathon.
15  Q.       Do you know if Mr. Woodard said he's
16  ever committed any employment violations?
17  A.       I just know what Marathon sent to
18  the EEOC regarding him.  They -- if you want me to
19  explain, I will.
20  Q.       Sure.  Sure.
21  A.       Okay.  The EEOC when we was talking
22  about -- what were we talking about.  We were
23  talking about Terry Fryer.  Well, Terry Fryer and
24  me hired in.
25  Q.       Terry who now?
```

144

```
1   A.       Fryer is his name.
2   Q.       Okay.
3   A.       So EEOC got -- they said they
4   kept -- how can I put this -- the EEOC that --
5   Marathon informed the EEOC that they hired -- they
6   fired me because they let one African-American go
7   from making errors and they didn't -- just
8   paraphrasing, they didn't want to take a chance
9   with me.  That's their wording, paraphrasing.
10  Q.       And how long has Mr. Woodard been
11  there, do you know, at Marathon?
12  A.       At that time about --
13  Q.       Oh, you said 20 plus years?
14  A.       No.
15  Q.       Okay.
16  A.       Jay Johnson.
17  Q.       That was Jay Johnson, I'm sorry.
18  All right.  All right.  I'm sorry.  How long had
19  Robert Woodard been there?
20  A.       He had been there approximately two
21  to three years when I left, so that's been almost
22  six years ago, so at that time two to three years.
23  Q.       So he was two or three years ahead
24  of you coming into Marathon?
25  A.       Yes.  Yes.
```

145

```
1   Q.       Okay.  And who is Terry Fryer?  I
2   haven't seen his name.
3   A.       Terry Fryer hired in with me.  What
4   they submitted -- Terry Fryer's name got involved
5   in it.  They put Terry Fryer's name as being a
6   black guy about that incident that I just told you
7   that had been committed.
8   Q.       I got you.  That was the wrong name.
9   Terry Fryer is a white guy?
10  A.       Terry Fryer is a white guy.
11  Q.       Right.  Okay.  I got you.
12  A.       But when we challenged that and told
13  them that Terry Fryer was a white guy, they said,
14  oh, it was Bernie Woodard we was talking about.
15  Q.       I got you.  Got you.  Okay.  Then
16  you list Dave Rice and Gerald Naliborski, is that
17  right, on Interrogatory No. 3?
18  A.       That's correct.
19  Q.       And then Justin Turner we talked
20  about.  The next one is Nick Warnock and Jordan
21  Daniel.  We talked about those two individuals;
22  correct?
23  A.       That's correct.
24  Q.       Terry Bavers should be Joe Bauers;
25  right?
```

146

1    A.      Yes, should be.
2    Q.      A mistake; right?
3    A.      Yeah, it's Joe Bauer instead of
4  Terry.
5    Q.      Jeff Davis, you just told me about
6  him a few minutes ago; right?
7    A.      Like I say, I don't know who Jeff
8  Davis is, but...
9    Q.      Right.  I got you.  If you turn over
10  to Interrogatory No. 6, it's a couple -- maybe one
11  page over.  This talks about anybody you've spoken
12  with.  The first guy is -- the first person,
13  excuse me, is Ernie Fitzpatrick.  What have you
14  and Mr. Fitzpatrick talked about?
15    A.      As far as?
16    Q.      Well, this asks anyone that you've
17  had conversations with regarding any of the claims
18  or defenses in this action.  So I guess what your
19  claims are in this case, I guess you've spoken
20  with Mr. Fitzpatrick about that?
21    A.      Jus about -- yeah, yeah.  Yes, sir.
22    Q.      Okay.  And what have you guys spoken
23  about?  Substance of those conversations?
24    A.      You don't have enough time, you want
25  to be out of here by -- no.

147

1    Q.      You told me a little bit about what
2  Mr. Fitzgerald (sic) has told --
3    A.      Right.  General about the case,
4  tracking on the case, basically.
5    Q.      What about -- Rosemary Turner is
6  your wife?
7    A.      Yes.
8    Q.      Byron -- I'm going to --
9    A.      Shropshire.
10    Q.      Okay.
11    A.      That's spelled wrong, but it's
12  Shropshire.
13    Q.      Byron -- hold on one second.
14  Another mistake here.  So how do you spell that?
15  How are you supposed to spell his last name, if
16  you know?
17    A.      It's all right except that I-R-E
18  instead of I-T-E.
19    Q.      Okay.  Shop --
20    A.      Shropshire.
21    Q.      Okay.  S-H-R-O-P-S-H-I-R-E?
22    A.      Wait a minute.  I'm going to give it
23  to you.
24    Q.      Okay.
25    A.      S-H-R-O-P-S-H-I-R-E.  All except

148

1  that R.
2    Q.      Okay.  Okay.  What have you and
3  Byron spoken about?
4    A.      Nothing of veracity, just general
5  case.
6    Q.      It says here he's an employee at
7  Marathon?
8    A.      Yes, he's a retired employee of
9  Marathon as of January of this year.
10    Q.      As of January?
11    A.      Might even be December, but he just
12  retired, yes.
13    Q.      Yeah.  Yeah.  Okay.  What was his
14  job at Marathon, if you know?
15    A.      He also was like Ernie, had a crew.
16  They're higher up, 35 year, 38 year person, but
17  just a crew leader.
18    Q.      A crew leader?  Okay.  And that's a
19  crew leader over utility operators?
20    A.      Yes, basically.
21    Q.      And so, again, my question may be --
22  let's just do it this way.
23    A.      No.
24    Q.      Byron would -- would Byron -- would
25  Dave Rice be over Byron?

149

1    A.      No, another area.
2    Q.      Okay.
3    A.      He's in the new north area, we're in
4  the south area.
5    Q.      Okay.  So he's in the new -- he was
6  in a different area?
7    A.      Yeah.  Yeah.  I knew you was going
8  to go there.
9    Q.      All right.  But Neil -- or, excuse
10  me, Gerald Naliborski would be over him?
11    A.      would be over everybody.
12    Q.      Okay.  Thank you for that.  Vic
13  Simpson.  Who is Vic Simpson?
14    A.      Just a friend.
15    Q.      Okay.
16    A.      Not a fried.  Another typographical.
17    Q.      Oh, yeah.  That's all right.  You
18  say he's an employee of Marathon; is that right?
19    A.      Retired.
20    Q.      Okay.  Do you know when he retired?
21    A.      Let's see, me and him retired --
22  around 2011, 2010 or '11.
23    Q.      Okay.  So that was before you came
24  in to Marathon?
25    A.      Yes.

---

150

1    Q.    Do you know how long he was at
2  Marathon, roughly?  I'm not asking --
3    A.    31, 32.
4    Q.    Okay.  And what was his job, if you
5  know, when he retired?
6    A.    He would have been one of the same
7  crew leaders or -- yeah, crew leader.
8    Q.    That would be over the utility
9  operators again?
10   A.    Yes.
11   Q.    What area of the plant was he in?
12   A.    South end.
13   Q.    So that would have been your area?
14   A.    Uh-huh.
15         So that would have been -- Dave Rice
16  would have been over him and Mr. Naliborski over
17  everybody?
18   A.    Yes.
19   Q.    What about -- what have you talked
20  to him about with respect to this case?
21   A.    Nothing of a personal, more so just
22  -- incidents or anything like that, do you know,
23  anything that would be relative to the case but...
24   Q.    Does he know anything that you think
25  is relevant to the case?

---

151

1    A.    Nothing other than what we have
2  here.
3    Q.    Okay.  Does he know about any of the
4  incidents involving these other folks?
5    A.    Sure.
6    Q.    Which ones does he know about?
7    A.    I would say all of them, Billy
8  Cristy.  No, maybe Nick wasn't there when he was
9  here -- he was there.  Maybe all but Nick and
10  Billy.  Nick Warnock and Billy Cristy, he was gone
11  before they were hired.
12   Q.    Okay.  What is Byron -- does Byron
13  know about any of these incidents, Byron
14  Shropshire, any of the incidents involving the
15  other individuals that you think were treated
16  differently?
17   A.    He would have firsthand knowledge
18  because he's in the new north area.
19   Q.    Sure.
20   A.    But it's all -- all of those
21  incidents are on a computer.  You could -- they
22  make training incidents out of all of them, so I'm
23  sure you know it through that way if nothing else.
24   Q.    What about Claude Smith, who is
25  Claude Smith?

---

152

1    A.    Old, old guy.  Claude is a former
2  employee also.
3    Q.    Former employee of Marathon?
4    A.    Uh-huh.
5    Q.    Did he retire or do you know?
6    A.    Yes, he retired.
7    Q.    How long was -- do you know when he
8  retired?
9    A.    No.  Claude is old old.
10   Q.    Do you know how long he roughly was
11  at Marathon?
12   A.    35 plus, maybe.
13   Q.    Okay.  Do you know what his position
14  was?
15   A.    No, I don't.  No, I don't.
16   Q.    Do you know in what area he worked
17  in, whether it was south end or new north or
18  another area?
19   A.    From what I remember of his job just
20  from general conversation with him, he -- Claude
21  wasn't an electrician, what other job would he
22  have been.  He was probably in one of those jobs
23  where you can be anywhere in the plant.  He might
24  have been an electrician or pipe fitter.  I think
25  pipe fitter is what he was, I think.

---

153

1    Q.    Do you know how long Mr. Naliborski
2  has been over the plant?
3    A.    No.
4    Q.    Okay.  Do you know if any of these
5  individuals, either Ernie Fitzpatrick -- well,
6  let's -- do you know if Ernie Fitzpatrick ever has
7  been disciplined in any way during his employment
8  with Marathon?  Does that come up in conversation?
9    A.    Knowing Ernie, I would say yes.
10   Q.    Knowing Ernie you would say yes?
11   A.    I would say yes.
12   Q.    Why would you say no -- why would
13  you say that?
14   A.    Knowing Ernie.
15   Q.    What about Ernie makes you think he
16  may have been disciplined?
17   A.    Ernie is a stickler for safety and
18  sometimes Marathon -- leave it at that.
19   Q.    Ernie is a stickler for safety and
20  you're saying Marathon is not?
21   A.    No, not, but there's some things
22  that he has brought them to attention to.  I don't
23  know personally, though.
24   Q.    Okay.  What about Byron Shropshire,
25  do you know, has that ever come up, if he was ever

---

154

1  disciplined by Marathon for any reason whatsoever?
2      A.    Him and Christ are probably both the
3  same, so, no.
4      Q.    Oh, Christ as in heaven?
5      A.    Yeah.
6      Q.    Okay.  I got you.
7      A.    Yeah.
8      Q.    So he's a good guy, probably not.  I
9  mean, it's never come up in conversation, put it
10  that way?
11      A.    No.  No.
12      Q.    What about Vic Simpson, do you know
13  if he's ever been disciplined?
14      A.    Another just straight arrow, no.
15      Q.    What about Claude Smith?
16      A.    Like I said, Claude was -- Moby Dick
17  was a minnow when he was born, so I would say not.
18      Q.    Never come up in conversation?
19      A.    Right.  Right.  Right.
20      Q.    Now, Ernie Fitzpatrick is
21  African-American male; right?
22      A.    All of these are African-American
23  males.
24      Q.    Yep, that was what I was going to
25  get at.  Byron Shropshire is an African-American

155

1  male?
2      A.    Yes, sir.
3      Q.    Vic Simpson is an African-American
4  male?
5      A.    Yes, sir.
6      Q.    And Claude Smith is also an
7  African-American male?
8      A.    Yes, sir.
9      Q.    All of whom worked at Marathon for
10  long periods of time and retired from Marathon;
11  correct?
12      A.    Yes.
13      Q.    Go back to your interrogatory
14  responses here.  Interrogatory No. 8 says -- talks
15  about damages in the case.  And you mention or you
16  put in your responses that you're seeking back pay
17  from January 3rd, 2013 until the present at
18  $100,000 per year.
19            Is that accurate?
20      A.    That's the low end.  They make 120
21  to 140.
22      Q.    You never made that?
23      A.    No.
24      Q.    Okay.  You're -- what you were
25  making that you said was like 33 dollars and some

156

1  cents an hour?
2      A.    Yes, they make 46 now.
3      Q.    Okay.  So that's how you came up
4  with that number, is you think that's on the low
5  end of what a utility operator makes generally?
6      A.    Yes.
7      Q.    You asked for punitive damages of
8  $100,000.  How did you come up with the
9  calculation on that number?
10      A.    Just going with what I read in the
11  law of it, on the Internet.  It's just a figure
12  that's comparable.
13      Q.    Comparable to what?
14      A.    Punitive damage.
15      Q.    Okay.  That was just something you
16  got off the Internet then?
17      A.    Yes.  Out of the EEOC -- not EEOC,
18  not EEOC law but Federal law as far as
19  discrimination.  In the Federal law, not EEOC law.
20      Q.    Okay.  And then embarrassment and
21  humiliation you have $250,000.  How did you
22  calculate that number?
23      A.    Through setback, agony, frustration,
24  the same reason with me.
25      Q.    Okay.  Did you sit down and try to

157

1  calculate what you thought your embarrassment was
2  as opposed to your humiliation or how did that --
3  was it just a round number you came up with that
4  you thought was --
5      A.    A round number.
6      Q.    -- thought was fair?  Just a round
7  number?
8      A.    Uh-huh.
9      Q.    Okay.  The next interrogatory there
10  talks about employment.  Are you currently
11  employed at AD Lewis Community Center?
12      A.    Yes, sir.
13      Q.    Okay.  How long have you been
14  employed at AD Lewis Community Center?
15      A.    August of '13.
16      Q.    August of 2013?
17      A.    Yes, sir.
18      Q.    What job do you do there?
19      A.    I'm maintenance, in charge of
20  maintenance.
21      Q.    How many -- it says here you're part
22  time; is that right?
23      A.    Part time.  Uh-huh.
24      Q.    And that you earn between 17 and 19
25  thousand dollars a year; is that right?

## 158

1    A.    Yes.

2    Q.    How many hours a week do you work on

3  average?

4    A.    36 to 40 or more.

5    Q.    So it's really not part time, then,

6  right?  It's full time?

7    A.    That's what my wife says all the

8  time, it ain't no part-time job.  And it's a

9  community center, so I give a lot of hours.

10    Q.    Sure.  Okay.  Have you been -- it

11  says also here you receive pension income of

12  $41,000 from Huntington Fire Department; is that

13  right?

14    A.    That's correct.

15    Q.    Since your employment at Marathon

16  ended, have you worked anywhere other than the AD

17  Lewis Community Center?

18    A.    Yes.

19    Q.    Okay.  Tell me where else you've

20  worked.

21    A.    For Malcolm Contracting.

22    Q.    Hold on one second.  Malcolm?

23    A.    Yeah, M-A-L-C-O-M (sic).

24    Q.    Okay.  And that's in Huntington?

25    A.    He's actually out of Summersville,

## 159

1  West Virginia.

2    Q.    Do you have that address?

3    A.    Not on me, no.

4    Q.    Did they issue you like tax

5  documents related to your employment?

6    A.    Uh-huh.

7    Q.    I don't think we have those.  Would

8  you have those?

9    A.    I gave you my tax documents.  I'm --

10  I gave my -- I submitted five years of tax

11  returns.

12    Q.    Okay.  I -- I don't know that we

13  got --

14    A.    Probably his address won't be in

15  there, but that income is in there from last year.

16    Q.    Okay.  And I think probably what --

17  and Mr. Dove may have sent them to us.

18    A.    Uh-huh.

19    Q.    I couldn't find them.

20    MS. REYNOLDS:  We'll check and see,

21  yeah, and it was from --

22    MR. BARNETT:  Malcolm Contracting.

23    MS. REYNOLDS:  Malcolm Contracting?

24    MR. HORNBACK:  I think it's just his

25  tax documentation, you know, the tax returns.  I

## 160

1  think maybe we just --

2    Q.    You want the W-2s?  Just -- the

3  return is what I sent.

4    Q.    Okay.  You sent the returns?

5    A.    Right.

6    MR. HORNBACK:  That's fine.  I don't

7  think we've gotten that stuff yet.

8    MS. REYNOLDS:  Okay.  So all of the

9  tax documents you're missing?

10    MR. HORNBACK:  Yeah.

11    MS. REYNOLDS:  Okay.  We'll look for

12  it.

13    Q.    So Malcolm Contracting, how much did

14  you work for Malcolm Contracting?

15    A.    We redo Kroger's, he, not we -- he

16  redo Kroger's, doing Kroger's all over America or

17  wherever Kroger is, revamping them or whatever you

18  want to call it.

19    Q.    Like a renovation?

20    A.    Yeah, total renovation.  Well, not

21  total but 99 percent reno.  Mm-hmm.  That's what

22  he do, but I just did the one in Huntington with

23  him.

24    Q.    Okay.  Just that one job?

25    A.    Yes.

## 161

1    Q.    How long did that take?

2    A.    April through October of last year,

3  so 12 -- I mean, April through October of '17.

4    Q.    '17, okay.  All right.  Other than

5  working at AD Lewis Community Center and Malcolm

6  Contracting, have you had any other jobs?

7    A.    No.

8    Q.    Okay.  Have you looked for any other

9  jobs?

10    A.    Sure.

11    Q.    How have you gone about your job

12  search?

13    A.    Ninety percent word of mouth, or I'd

14  say a hundred percent because I ain't been looking

15  for none other than word of mouth, yeah.

16    Q.    What have you -- who have you talked

17  to about trying to find a job by word of mouth?

18    A.    Who have I talked to about it?

19    Q.    Well, you say word of mouth, I'm

20  trying to understand what that means, I guess.

21  Can you tell me what it means?

22    A.    Family, word of mouth.

23    Q.    Okay.  Have you submitted any

24  applications anywhere?

25    A.    Sure.

162

```
1    Q.      Where have you submitted
2  applications?
3    A.      Calgon Carbon.
4    Q.      Hold on one second, Calgon?
5    A.      Calgon Carbon.
6    Q.      Carbon.  Where is that located?
7    A.      Right beside Marathon on 23 in
8  Kentucky, Catlettsburg, Kentucky.  U.S. 23.
9    Q.      Okay.  When did you -- do you recall
10 when you submitted an application there?
11   A.      I just submitted my last one.  I've
12 submitted to them twice.  The last one was
13 June 27th this year.
14   Q.      Of '18?
15   A.      Uh-huh.
16   Q.      Have you heard back definitely one
17 way or another?
18   A.      Yes.
19   Q.      What job -- and I'm assuming you did
20 not obtain that position?
21   A.      No.
22   Q.      What kind of job were you applying
23 for?
24   A.      What did they call that.  Basically
25 a sacker, bagger or something like that.
```

163

```
1    Q.      What type of facility is Calgon
2  Carbon?
3    A.      They make carbon.  They make carbon.
4    Q.      Any other application or places
5  you've applied to for work?
6    A.      I don't know that printing place's
7  name.  They changed it from Aaron's, they call it
8  something else now.  It's a copier, not printer,
9  copier repair place, sales and repair.  It's in
10 Huntington, but I -- it used to be Aaron's but
11 it's not Aaron's no more.  I forget the name of
12 that place.  They just changed it about last year
13 or two.
14   Q.      Do you know what street it's located
15 on in Huntington?
16   A.      8th Avenue and 11th Street,
17 Huntington, West Virginia.
18   Q.      8th Avenue and 11th Street?
19   A.      11th Street.  Uh-huh.
20   Q.      Okay.  Any other places that you've
21 submitted applications?
22   A.      Not that I can recall.
23   Q.      Okay.  Have you gone online and
24 tried to look at any job site --
25   A.      No.
```

164

```
1    Q.      -- job website type things, like
2  Indeed or anything like that?
3    A.      No, sir.
4    Q.      Okay.  I want to talk a little bit
5  about -- you've asked in this lawsuit for damages
6  for embarrassment and humiliation.  I want to talk
7  a little bit about those two things.  First of
8  all, let's talk about embarrassment.  What has --
9  what type of embarrassment have you gone through
10 with respect to your termination of employment at
11 Marathon?  Describe it to me if you can.
12   A.      Well, the embarrassment and
13 humiliation would be not getting to send your kid
14 to the college that you promised him, still
15 driving an '02 vehicle, no renovations as planned,
16 vacations have stopped, and to have to explain to
17 your family and kids why.
18   Q.      What did you tell them?  What did
19 you tell your kids and your wife about your -- the
20 termination of your employment from Marathon?
21   A.      Told them exactly what happened, I'm
22 fired.
23   Q.      Well, did you tell them why?
24   A.      They wouldn't understand why.  Fired
25 is fired.  Yes, I told them why the valve just
```

165

```
1  didn't open.  You know, fired is fired as far as
2  telling your family.
3    Q.      Did you tell them you thought you
4  were fired because of your race?
5    A.      Yes, I did.
6    Q.      And how did they respond to that?
7    A.      Well, you treat that with a kid
8  glove because you don't want your kids to use that
9  as a crutch to -- although I did send them to
10 college, they went to Marshall instead of WU,
11 ain't bad, but you don't want them to go through
12 life thinking crutches are your race or your
13 gender, religion or...
14         You handle that with -- everybody
15 would handle it different.  I handled it to keep
16 them moving forward and positive.
17   Q.      And that's what I'm trying to
18 understand.  How did -- what did you tell them in
19 respect to your belief that you were fired because
20 of your race?  How did you handle that with your
21 kids?
22   A.      There wasn't no special way that I
23 can explain how.  There ain't no book on how you
24 explain to your kids that you was fired because of
25 race.  You have to go through this process, Dad,
```

### 166

1  when is the suit, Dad, when is this, when is that?
2  You know, you've told them and hopefully it will
3  just die in their head but, you know, kids get
4  old, they still ask questions.
5       Q.     Sure.  Do your kids -- they went to
6  Marshall; is that what you said?
7       A.     My oldest went to Marshall, now he's
8  in the military.  My youngest is still in
9  Marshall.  All of them went to Marshall.  My
10 daughter didn't finish.  She's the oldest.
11      Q.     All right.  And that's where you
12 went, right, Marshall?
13      A.     Yes.
14      Q.     Your oldest is in -- or the oldest
15 boy is in the military; right?
16      A.     Yes.  He's having a first grandbaby
17 the 21st of this -- last month.
18      Q.     Congratulations.
19      A.     Get to leave and see him tomorrow.
20      Q.     Your daughter did not finish
21 Marshall?
22      A.     No.
23      Q.     What does she do for living?
24      A.     She works at Chipotle's, a line
25 manager, that 50 cent will get you a cup of coffee

### 167

1  but you better have 50 cent.
2       Q.     And your younger son is still in
3  Marshall?
4       A.     Yes.
5       Q.     You have three kids?
6       A.     Yes.
7       Q.     What's your youngest son studying?
8       A.     Criminal justice and he's trying to
9  go into teaching, trying to help dad, you won't
10 have to pay so much, Dad, they'll pay this back.
11      Q.     Oh, I got you, if he goes into --
12      A.     Education.
13      Q.     They repay some of the loan?
14      A.     They have some of -- yeah, some of
15 those.
16      Q.     Do your kids have student loans or
17 were you able to pay --
18      A.     Oh, yeah.
19      Q.     Did you have student loans when you
20 were going to school?
21      A.     Sure did and do.
22      Q.     Welcome to the club on that one.
23      A.     That's right.  Like I say, I didn't
24 start until late, so the bill comes late.
25      Q.     That's right.  Okay.  Do you feel

### 168

1  like your children are well adjusted to society?
2       A.     Knock on wood I've kept them -- none
3  of us have ever been in the penal system, raised
4  in the church, thank God for life, health and
5  strength, so they're well rounded.
6       Q.     Good.  Do you still see them quite a
7  bit?
8       A.     They live with me.
9       Q.     They still live with you?
10      A.     They don't leave.  My oldest is
11 there and my youngest is there.  Middle is off in
12 the military.  She tried -- both of them tried.
13 Zach tried last year paying that 45,000 thousand
14 dollars working part time and going to school,
15 still having to come home and eat and, you know.
16 Zach, I told you it wasn't that tough -- I mean,
17 it wasn't that easy.  Bri, it just took her about
18 six months and she was back in the house, no, Dad.
19 Did you-all use my room for anything else?  Your
20 mama is going ready to make the craft room, so
21 you're about a month --
22      Q.     A month away?
23      A.     A month in time.
24      Q.     Well, I understand that.  Anything
25 else about embarrassment that you haven't --

### 169

1  you've told me several things here.  Anything
2  about the embarrassment piece of this that you
3  would want to add?
4       A.     No, just -- the embarrassment is
5  just being fired.  That don't sound good on you.
6       Q.     Is humiliation essentially the same
7  thing?
8       A.     Same thing, one and another -- one
9  and the same.
10      Q.     Okay.  Okay.  That's fair enough.
11 Okay.  What about --
12      A.     The humiliation is driving that 2002
13 Buick LeSabre.  That's humiliation.
14      Q.     What's that now?
15      A.     The humiliation is driving that 2002
16 Buick LeSabre.
17      Q.     Wow.  I can hear you on that.  I'm
18 about in the same boat for different reasons.  You
19 know, how about -- you know, I mentioned -- I saw
20 somewhere where you had taken trazodone.  What is
21 trazodone?
22      A.     It's a mood depressant, sleep --
23 help with sleep.  Another embarrassing term, what
24 do they call it, not your mood, your -- I'll think
25 of it here in a second.  It's just your persona,

Gary Turner

---

**170**

```
1    it's a mood swing medicine.  They give it to you
2    for everything, you need to sleep, here, take
3    trazodone, you need -- what is that word.  It's
4    just a depressant pill.
5            Q.      Okay.  When did you start taking
6    that?
7            A.      2014.
8            Q.      Okay.  Was there anything in your
9    life that happened in 2014 where you started
10   taking that?
11           A.      Money was leaving.  Money, just
12   money.  Just you wasn't where you wanted to be.  I
13   diagnosed myself with that, you know.  Other than
14   that, I'm healthy as a rock.
15           Q.      Well, good.  You're healthy, you got
16   your health, that's one thing.
17           A.      Yep.
18           Q.      And you just weren't at the point of
19   your life where you thought you would be, maybe;
20   is that accurate?
21           A.      Right.  Right.
22           Q.      Okay.  Fair enough.  Had you ever
23   taken any type of depressant pill, antidepressant
24   pill or a sleep medication or anything like that
25   before?
```

---

**171**

```
1            A.      Never.
2            Q.      Okay.  And I don't want to get too
3    personal, but your daughter, she's your oldest
4    child?
5            A.      Yes.
6            Q.      And what's her --
7            A.      She's actually my stepdaughter, but
8    she's my daughter.
9            Q.      Sure.  What is her name?
10           A.      Bria Chante Pankey, C-H-A-N-T-E,
11   apostrophe, Pankey, P-A-N-K-E-Y.
12           Q.      And what was -- when was the year
13   she was born; do you know?
14           A.      1993.
15           Q.      '93, okay.  And then your oldest son
16   that went to Marshall that's now in the military,
17   what is his name?
18           A.      Jordan Thomas Turner.
19           Q.      And what was the year of his birth?
20           A.      1995.
21           Q.      Okay.  And then your youngest son --
22           A.      Zachary Ryan Turner.
23           Q.      Zachary Ryan Turner.  And what was
24   the year of his birth?
25           A.      '98.
```

---

**172**

```
1            Q.      1998.  Okay.  Thank you.
2            A.      I dare you ask their birthday, then
3    you'll say, that's why you're depressed, they were
4    all born in August.
5            Q.      Everything hits at once; right?
6            A.      Yeah.  My wife was August 13th, my
7    youngest is August --
8            MR. BARNETT:  Hang on.  Let's not go
9    on the record with birthdays.
10           Q.      I'll hand you another exhibit here.
11   (TURNER DEPOSITION EXHIBIT 19 MARKED)
12           Q.      This is -- Mr. Turner, I'll tell you
13   that this is a few of the documents that we
14   received from AD Lewis.  I didn't realize that it
15   was connected to the City of Huntington when I
16   initially sent out the subpoena, but we got a
17   bunch of stuff and so I wanted to ask you about a
18   few of these.  For the record, these are
19   Bates-stamped AD Lewis 3 through 5.  If you go --
20   if we start at the last page and move forward, it
21   looks like you started in August of 2014, is that
22   right, at AD Lewis?
23           A.      '13.
24           Q.      Okay.  '13, I'm sorry.  Were you
25   making $7.50 an hour at that point?
```

---

**173**

```
1            A.      Making what?
2            Q.      $7.50 per hour?  It says right here
3    hourly base rate.  I just didn't know if that's,
4    you know, when you started out or...
5            A.      When did the minimum wage change?
6    That's whatever the minimum was at that time, but
7    I thought it was 8 at that time, but that's
8    basically right.
9            Q.      If you flip on to the next page, the
10   AD Lewis 4.
11           A.      About 8.50.
12           Q.      There's an 8.50?
13           A.      Yeah.
14           Q.      And then in 2016 it looks like you
15   went up to $9.50?
16           A.      Yes, sir.  Yes.
17           Q.      Okay.  You're still working for AD
18   Lewis today?
19           A.      That's correct.
20           Q.      And what is your hourly rate today?
21           A.      9.50.
22           Q.      So you stayed at 9.50?
23           A.      Uh-huh.
24           Q.      And you say you're working pretty
25   much a full-time job now, 40 hours a week, 35 to
```

---

Gary Turner

---

**174**

```
1    40?
2         A.      Yes.  Excuse me.  Yes, sir.
3         Q.      And you're doing -- what type of
4    work are you doing for them?  I know you mentioned
5    maintenance, but what type of actual --
6         A.      I'm in charge of a pool, a football
7    field, two or three buildings, lawn equipment,
8    playground.  It's about a four city block
9    facility.
10        Q.      Okay.  Do you enjoy it?
11        A.      I love it.  Got hometown hero this
12   year.
13        Q.      Did you really?
14        A.      Yes.
15        Q.      Congratulations.
16        A.      May of this year.
17        Q.      Was that publicized throughout
18   Huntington?
19        A.      WSAZ.
20        Q.      On TV even?
21        A.      Oh, yeah.  Oh, yeah.  They got me on
22   that one.  I owe them one.
23        Q.      So you're like a celebrity up there
24   now; right?
25        A.      Well, that and 50 cent will get you
```

---

**175**

```
1    a cup of coffee but you better have your 50 cent.
2         Q.      I hear you.  I hear you.
3         (TURNER DEPOSITION EXHIBIT 20 MARKED)
4         Q.      This again is some documents -- or a
5    few documents from your super from AD Lewis.  Does
6    this look like your handwriting on this document,
7    sir?
8         A.      Yes.
9         Q.      If you look on the last page, it's
10   signed by you in August of 2014; is that right?
11              MR. BARNETT:  Are you calling this
12   20?
13              MR. HORNBACK:  Yes.
14              THE WITNESS:  Yes, but I started
15   there in 2013, I thought.  This says '14.  Been
16   there five years.  What is today.  But that says
17   '14.
18        Q.      Okay.  You thought you started in
19   '13?
20        A.      In fact, I know I started in '14 --
21   I mean, '13.  I know I started in '13.
22        Q.      Okay.  That's fine.  That's fine.
23   What I really wanted to ask you, if you turn over
24   to AV Lewis 47, it has your employment record.
25        A.      What did you say?  Oh, 47.
```

---

**176**

```
1         Q.      47, yes, sir.  It has your
2    employment record there and it asks you to list
3    everywhere you've been employed in the last
4    ten years.  And I didn't see Marathon on there.
5    And I just wanted to ask you why you didn't put
6    Marathon on the employment record here.
7         A.      No special reason, I guess.
8         Q.      Just maybe an oversight?
9         A.      Not really, not an oversight.  I
10   don't feel I worked there.  I wasn't there but
11   five months, but it -- so I just gave the
12   pertinent --
13        Q.      Okay.
14        A.      -- information, I guess.
15        Q.      All right.  That's fine.
16        A.      I don't never tell anybody about
17   Marathon because of the embarrassment and
18   humiliation.
19        Q.      So you avoid that humiliation and
20   embarrassment by not telling people; right?
21        A.      Yep.
22        Q.      Hand you the next exhibit.
23        (TURNER DEPOSITION EXHIBIT 21 MARKED)
24        Q.      This is also a document we received
25   from AD Lewis dated May 21st, 2004, and it has to
```

---

**177**

```
1    do with the suspension that you received
2    apparently from the fire department; do you recall
3    that?
4         A.      Yes.
5         Q.      Okay.  And I'll hand you this
6    document.
7         (TURNER DEPOSITION EXHIBIT 22 MARKED)
8              MR. BARNETT:  Are you making this an
9    exhibit?
10             MR. HORNBACK:  26, yeah.
11             MR. BARNETT:  26?  I'm on 22.
12             MR. HORNBACK:  22, I'm sorry.  22,
13   yeah.  This next one is 22.
14        Q.      This one is also a document received
15   from AD Lewis, findings of fact and conclusions of
16   law of the Firemen's Civil Service Commission; do
17   you remember that?
18        A.      Yes.
19        Q.      And this happened back -- this
20   incident happened back in April of 2004; correct?
21        A.      Yes.
22        Q.      And under findings of fact,
23   paragraph No. 3, it says that on or about
24   April 6th, 2004, the medical review officer report
25   came back from Lieutenant Gary Turner's drug test,
```

---

Certified Court Reporters
502-648-6390                              EXHIBIT 1

**178**

1   which indicated a refusal to test on the part of
2   Lieutenant Turner.  As a further note, the medical
3   review officer noted that Lieutenant Turner's
4   specimen was adulterated with tap water.  And then
5   it goes on to conclude that you violated a
6   policies by -- a policy by adulterating your test
7   result.  Do you remember this incident?
8        A.     Yes, sir.
9        Q.     Did you in fact adulterate a drug
10  test with tap water?
11       A.     Yes, I added some water to get my
12  count up to the line.  Yes, I did.
13       Q.     Explain to me why you did that
14  again.
15       A.     Basically to get out of there.  I
16  mean, I had been in there trying to pee, pee, pee,
17  drinking water, water, water.  And I went in there
18  one time, you got to get up to a certain --
19  whatever the count is.  So I couldn't pee and she
20  refused to take it.  So we sat there maybe another
21  35, 40 minutes, about the same amount tinkled out
22  and I said, hell -- no, I didn't say that, I said,
23  I'll just add a little water and we'll be out of
24  here.  That's what I did.
25       Q.     Did you know you weren't supposed to

**179**

1   do it?
2        A.     Yes, I did.  Yes, I did.
3        Q.     And it says -- if you turn over to
4   the next page, it says that they suspended you
5   without pay; is that right?
6        A.     Yes.
7        Q.     For, I guess, 180 days, that's
8   6 months?
9        A.     Six months.  Six months, yes.
10       Q.     And were your kids living in your
11  home at this time?
12       A.     Yes, they were.
13       Q.     Were you embarrassed by this event?
14       A.     Yes, I was.
15       Q.     Okay.  How long did it take you to
16  get over being embarrassed by this event?
17       A.     Six months when I got working again.
18  Six months.
19       Q.     Did you tell your children what had
20  happened, that you had been found to adulterate a
21  drug test?
22       A.     It was in the newspaper and all that
23  stuff.
24       Q.     It was in the newspaper?
25       A.     Yes.  That's a fireman's job, it was

**180**

1   public knowledge.  That was in the newspaper.
2        Q.     And this Marathon thing wasn't in
3   the newspaper, was it?
4        A.     No.
5        Q.     And after this incident your kids
6   still love you; right?
7        A.     Absolutely.
8        Q.     It was a mistake and you paid your
9   penalty and you moved on; right?
10       A.     Yes, I did.
11       Q.     Okay.  Let me look over my -- can we
12  take a break real quick?
13       A.     Sure.
14              (RECESS)
15       Q.     Mr. Turner, would you agree that
16  applying lockout/tagout to a sight glass is a
17  basic operator task?
18       A.     For a utility operator, yes.
19       Q.     You mentioned and we looked at the
20  meeting notes regarding this December 26th, 2012
21  incident when Dave Rice was there and then Katie
22  Scherer was there as well; correct?
23       A.     Yes, sir.
24       Q.     And you mentioned Mr. Naliborski was
25  over all -- over the entire facility; is that

**181**

1   right?
2        A.     He was general plant manager.
3        Q.     But you never worked directly with
4   him; correct?
5        A.     Correct.
6        Q.     And you never really talked to him
7   very much; is that accurate?
8        A.     No, not after orientation or
9   whatever.
10       Q.     But you said he was the one that
11  communicated to you that your employment would be
12  terminated?
13       A.     He was the one.
14       Q.     Okay.  And you made a claim in this
15  case for race discrimination.  I think your
16  complaints says you were terminated solely based
17  on your race.
18       A.     Yes.
19       Q.     And that's what you believe?
20       A.     That's what I believe.
21       Q.     Is Dave Rice a racist?
22       A.     I don't know Dave Rice.
23       Q.     Mr. Rice, who was in your --
24       A.     Oh, oh, oh.  I'm saying I don't know
25  him as far as knowing whether he's a racist or

Gary Turner

**182**

1  not.  I wouldn't dare to venture to say he was or
2  not.  I don't know him.
3       Q.      Is Katie Scherer a racist?
4       A.      I don't know none of them
5  personally.
6       Q.      You're saying you were -- we've got
7  three people that were at least involved at some
8  level of your -- the investigation surrounding
9  this December 26th incident and I'm trying to
10 figure out -- you say you were fired because of
11 your race, I'm trying to figure out who the racist
12 is out of the three of them.
13             MR. BARNETT:  Objection to form.
14      Q.      That's fine, you can answer.  You
15 said you don't know if Katie Scherer is a racist?
16      A.      What I will say is the way that he
17 told me I didn't look like an oilman, I don't know
18 what an oilman looks like to you.  I thought a man
19 looked like a man.  That was a racist statement in
20 its context and the way he put that out there to
21 me, so...
22      Q.      That was your impression of what he
23 said?
24      A.      That's what he said in general.
25      Q.      And you told me what he said

**183**

1  earlier, you wrote it down in your EEOC?
2       A.      Right.  Right.
3       Q.      So you think Mr. Naliborski is the
4  racist?
5       A.      I did not say he's a racist.  That
6  comment was a racist style comment in my opinion.
7       Q.      Okay.
8       A.      Not him.
9       Q.      Are you prepared to say under oath
10 that you think Mr. Naliborski is a racist?
11             MR. BARNETT:  Objection, asked and
12 answered.
13      Q.      You can answer again.  Do you think
14 he's a racist or not is all I'm asking?
15      A.      I don't know him to form an opinion
16 whether they're racist or not.
17             MR. HORNBACK:  Okay.  All right.  I
18 think that's all the questions I have at this
19 time.  I don't know if your counsel will have
20 questions or not.
21             MR. BARNETT:  I've got some
22 questions.
23             MR. HORNBACK:  Okay.
24
25                  EXAMINATION

**184**

1
2  BY MR. BARNETT:
3       Q.      Gary, I'm going to ask you just a
4  handful of things and I think we can be out of
5  here unless defense counsel has anything else for
6  you.  I think you testified and what I wrote down
7  was that when you were talking with Byron
8  Shropshire that you didn't talk with him about
9  anything of veracity.  You know, did you talk to
10 him about nothing of importance?
11      A.      Concerning the -- Marathon or...
12      Q.      Concerning your claims or this suit.
13      A.      Basically what I used, the Claudes
14 and the Vics and those type of people was in
15 taking a 450 personnel sheet and identifying all
16 who was white and who was black and who was
17 relatives.
18      Q.      You also talked to them about prior
19 incidents?
20      A.      Yes.
21      Q.      And -- but when you said -- if I
22 represented to you the word veracity means
23 truthfulness, when you said nothing veracity, you
24 weren't talking about untruthful stuff with Byron
25 Shropshire specifically; correct?

**185**

1       A.      Oh, yeah.  No.
2       Q.      Okay.  You talked about your
3  embarrassment and humiliation and having been
4  embarrassed by being jobless; is that correct?
5       A.      That's correct.
6       Q.      Is there any degree of embarrassment
7  and humiliation associated with being the lone
8  black man fired behind similar conduct in a
9  workplace full of white people who weren't fired?
10             MR. HORNBACK:  Objection to the
11 form.
12      Q.      You can answer.
13      A.      That definitely plays a big role
14 when you say that you were the only -- it
15 definitely was in the mindset.  There's no other
16 reason absent that reason I would have been still
17 there.
18      Q.      Were you embarrassed and humiliated
19 when you were walked out or walking out the day
20 that you were let go?
21      A.      Definitely then.
22      Q.      Or rather the day that you were
23 fired.  Were you embarrassed or humiliated, you
24 know, after that when you talked with current or
25 former employees of Marathon?

Certified Court Reporters
502-648-6390                        EXHIBIT 1

186

1    A.    Yes, sir.
2    Q.    Do you continue to be embarrassed
3  and humiliated based on your treatment based on
4  the color of your skin?
5    A.    Yes, I do.
6    Q.    And I want to go to Exhibit 12,
7  Bates stamp Marathon 107 or beginning of Bates
8  stamp Marathon 107.  These are, I'm assuming
9  because the way testimony has been right that
10  these are training reports from Marathon; is that
11  accurate that that's what they are?
12    A.    Yes, they are.
13    Q.    The date of the incident that led to
14  your firing was December 26th of 2012; right?
15    A.    That's correct.
16    Q.    What day were you actually fired?
17    A.    January the 3rd, 2013.
18    Q.    After the incident December 26th,
19  did you come to work the next day?
20    A.    No, sir.
21    Q.    How many days was it is until you
22  came back to Marathon?
23    A.    Four days.  I was let go the 26th
24  and I came back the 1st -- let's see, let me get
25  that right.  Four-day drop, so 26th, 27th, 28th,

187

1  29th, 30th, 31st.  I came back the 31st.
2    Q.    What do you mean a four-day drop?
3    A.    That's terminology for Marathon's
4  long break after...
5    Q.    A long break after what?
6    A.    Like, say, shift work and after you
7  do I guess a calendar month of 20 days, you get a
8  4-day break.
9    Q.    So it wasn't like you'd put in for
10  special vacation those days?
11    A.    No.
12    Q.    It wasn't like you were told to stay
13  home because of the incident?
14    A.    No.
15    Q.    But you were home on a four-day
16  break?
17    A.    Four-day break.
18    Q.    And so if these records reflect you
19  completed self-study trainings on December 29th,
20  you would have been home those days?
21    A.    I would have been home those days.
22    Q.    Can you access these self-study
23  trainings from home?
24    A.    No.
25    Q.    Are they done on the computer?

188

1    A.    Marathon's computer.
2    Q.    Marathon's computer.  But you can't
3  get on Marathon's computer from your house?
4    A.    No.
5    Q.    So if they reflect that you did any
6  training on December 29th of 2012, that would be
7  inaccurate?
8    A.    It would be inaccurate.
9    MR. BARNETT:  Okay.  That's all the
10  questions I have.
11
12    FURTHER EXAMINATION
13  BY MR. HORNBACK:
14
15    Q.    Let me ask you a question.  Do you
16  still have embarrassment or humiliation from it
17  being broadcast in your community that you
18  adulterated a drug test while you were a fire
19  department employee?  Does that still affect you
20  today?
21    A.    I feel ashamed still.
22    Q.    And you mentioned that was
23  publicized on at least the TV station; correct?
24    A.    Newspaper.
25    Q.    Newspaper.

189

1    A.    I don't remember seeing it on TV.
2    Q.    Okay.  I'm sorry, the newspaper.  Do
3  you still think about that when you're around
4  town, wondering if people know that about you?
5    A.    Okay.  How was that -- when you were
6    Q.    Okay.  How was that -- when you were
7  found guilty of adulterating the drug test, did
8  you lose sleep?
9    MR. BARNETT:  Object.  I don't
10  believe he was found guilty.
11    THE WITNESS:  Of nothing.
12    Q.    When you were suspended for six
13  months after Civil Service Commission found that
14  you did in fact adulterate a drug test, did you
15  lose sleep at all?
16    A.    Yes, I did.
17    Q.    Did it affect your ability to eat?
18    A.    Sitting here today I would say no,
19  but back then it probably did.
20    Q.    Did you have to explain it to your
21  children?
22    A.    No.
23    MR. BARNETT:  Objection, asked and
24  answered.
25    Q.    I'm sorry, I just didn't hear.

190

```
1        A.    I said, no, I didn't.
2        Q.    You didn't explain it to your kids?
3        A.    No.
4        Q.    Was there a reason why you didn't
5   tell them?
6        A.    No need to tell them, I guess.
7        Q.    Did they know -- I mean, were you at
8   home for six months?
9        A.    They were young at that time.
10       Q.    Were you at home for six months?
11       A.    Yes.
12       Q.    Did they ever ask you why daddy is
13  home rather than at work?
14       A.    I guess, yes.  Not like you're
15  saying where they asked that, but I guess they
16  could have noticed I'm home because the fire
17  department has 24-hour shifts, so -- but they
18  never asked that.
19       MR. HORNBACK:  Okay.  I think that's
20  all I have.
21       MR. BARNETT:  That's all I've got.
22       MR. HORNBACK:  Thank you for being
23  here.  We appreciate it.
24       (DEPOSITION CONCLUDED AT 1:50 P.M.)
25
```

191

```
STATE OF KENTUCKY   )(
COUNTY OF JEFFERSON )(

        I, CATHERINE SHAY, Notary Public,
State of Kentucky at Large, hereby certify that
the foregoing deposition was taken at the time and
place stated in the caption; that the appearances
were as set forth in the caption; that prior to
giving the testimony the witness was first duly
sworn by me; that said testimony was taken down by
me in stenographic notes and thereafter reduced
under my supervision to the foregoing typewritten
pages; and that said typewritten transcript is a
true, accurate and complete record of my
stenographic notes so taken.
        I further certify that I am not
related by blood or marriage to any of the parties
hereto and that I have no interest in the outcome
of the captioned case.
        My commission as Notary Public expires
March 6, 2019.
        Given under my hand this the _____day
of _____, 2018, at Louisville, Kentucky.

                _____
                CATHERINE SHAY
                NOTARY PUBLIC
```