Eastern District of Kentucky
F I L E D
JUN 17 2019
AT ASHLAND
ROBERT R. CARR
CLERK U.S. DISTRICT COURT

UNITED STATES DISRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
ASHLAND

Civil Action NO. 18-15-HRW

GARY TURNER,                                         PLAINTIFF,

v.            **MEMORANDUM OPINION AND ORDER**

MARATHON PETROLUEM CO. LP,            DEFENFDANT.

This matter is before the Court upon Defendant Marathon Petroleum Company, LP's Motion for Summary Judgment [Docket No. 11]. The matter has been fully briefed [Docket Nos. 11-1, 16 and 18]. For the reasons set forth herein, the Court finds that the Defendant is entitled to judgment as a matter of law.

**I.**

This case arises from Gary Turner's employment with, and ultimate termination from, Marathon Petroleum Company, LP's ("MPC") refinery in Catlettsburg, Kentucky.

**A.**

The facts are, for the most part, undisputed. On December 14, 2010, Plaintiff completed an application for employment at MPC. [Docket No. 11-6]. After interviews with MPC personnel several interviews with MPC personnel, Plaintiff was hired and began his employment with MPC on August 6, 2012 as a Utility Operator at MPC's Catlettsburg petroleum refinery. [Deposition of Gary Turner, Docket No. 11-1, p. 32].

1

According to MPC's job description, the primary responsibility of a Utility Operator at is to oversee the day to day operations of either the tank farms or other various operating units within the refinery, which includes monitoring equipment; recording readings from equipment and making required adjustments; detecting unusual operating conditions (such as noises, abnormal temperatures or pressure, and leaks); and responding to emergency situations. [Docket No. 11-8]. To perform this job, Utility Operators must understand refining process operations, complex refinery related materials, product movements, and many different procedures to be executed during the performance of the job, including, but not limited to, opening and closing various sized valves. *Id.* Plaintiff does not dispute this description. [Docket No. 11-2, pp. 33-36].

Plaintiff testified that on his first day on the job, he was given a copy of the General Work Rules for the refinery. *Id.* p. 47. These rules specifically state that all employees are responsible for adhering to safe work processes, following all safety rules, safe work instructions, operating procedures, and wearing all required protective clothing and equipment. [Docket No. 11-9].

The General Work Rules also set forth MPC's disciplinary process for improper work conduct, noting that certain conduct, including "job negligence, unsafe work practices, performing work in a careless nature, or violation of life critical rules," may warrant discipline up to and including termination for the first offense. *Id.*, pp. 7-8.

These rules also note that MPC considers the employee's past record, as well as the gravity of the specific offense and the surrounding circumstances, in determining the appropriate discipline to administer. *Id.*

**B.**

From August 6, 2012 until around early October 2012, Plaintiff attended an eight (8) week training class located on the MPC property, which provided him with a general introduction to the refining process. [Docket No. 11-2, pp. 27 & 32 and Affidavit of Katie McKnight, Docket No. 11-7].

After the training period, on October 1, 2012, Plaintiff began a 120-day probationary period. *Id.* During this probationary period, Plaintiff received further training, such as: basic operator training; process safety management; performing lock out/tag out of equipment; training on how to check valves to ensure they were operating correctly; hazardous recognition awareness; sight glass procedures; training related to placing and removing valves from service; and a vast array of other process and safety training. [Docket 11-2, pp. 55-72]. The training included watching experienced Utility Operators perform their jobs. *Id.* Plaintiff testified that he received "a lot of training" by MPC, and this training was continuous throughout his employment. *Id.*

**C.**

During the probationary period, employees receive a written performance evaluation which Plaintiff admits in his brief in opposition to MPC's dispositive motion, was "mixed." The evaluation occurred on October 29, 2012 and is memorialized in a 7-page form, signed by a Foreman, Plaintiff and a representative from MPC's Human Resources department, Katie McKnight. *Id.* In the evaluation, it is noted that Plaintiff "demonstrated a good attitude and a desire to learn," several competencies, such as stress management, safety and environmental, process operation, equipment reliability, and troubleshooting, were marked "N/A" because Plaintiff was "still in the training process" and MPC did not yet have enough information about

Plaintiff's abilities in these areas to evaluate the same. [Docket No. 11-10]. Plaintiff scored on the low-end of "On Target" with respect to process understanding, equipment understanding, and instrumentation. *Id.* Plaintiff was marked "Does Not Meet Expectations" with regard to his communication skills, noting that he "needs to improve on terminology." *Id.* Plaintiff was given an Overall Performance Rating at the low-end of On Target. *Id.*

**D.**

The event that lead to Plaintiff's termination occurred on December 26, 2012, during his probationary period. On that day, Plaintiff was working in the Low Pressure Continuous Catalyst ("LPCCR") area of the refinery. [Docket No. 11-2, pp. 94-95]. Plaintiff concedes that the LPCCR unit processes gasoline, and therefore that area presents a significant risk of fire and explosion. *Id*, p. 54.

Plaintiff testified that the Day Foreman, Travis Gillum, asked him to perform a "lock out/tag out" on the west site glass so it could get repaired. *Id.*, p. 96. According to Plaintiff, Mr. Gillum physically showed him exactly what to do. *Id.*, p. 107. Plaintiff even took notes on the instructions given to him by Mr. Gillum. *Id.* Plaintiff testified, "[i]t seemed simple enough" because applying lock out/tag out to a sight glass is a basic Utility Operator task. *Id.*

After completing another job task, Plaintiff returned to the location of the sight glass but was confused about what Mr. Gillum asked him to do. *Id.*, pp. 100,106. However, he did not ask him for clarification or further instruction. *Id.* Instead, Plaintiff testified, "**[t]hat's where stupid came in.**" *Id.*, pp. 97-98 (emphasis added). Specifically, Plaintiff closed the wrong valve, which had no relationship to the equipment he was supposed to be working on. *Id.*, p. 100-101. This caused the LPCCR unit to exceed its rated pressure (also known as a Not to Exceed ("NTE")).

An NTE is a significant safety event, when the pressure inside a pipe exceeds this limit, "it could be hazardous to the structure of the pipe itself." The LPCCR unit had to be evacuated. *Id.*

### E.

MPC investigated this incident. During the investigation meeting, Plaintiff admitted to that he failed to do his job but offered no reason clear as to why.

> Q. Did you know your job was to isolate the sight glass? Did you know the 8" valve was not the sight glass.
>
> A. I do, I just didn't process it at first. I didn't go up and look at it when Travis was explaining it to me and I should have.
>
> Q. Do you understand the reason why that was not the appropriate valve to close?
>
> A. Yes, I don't know why I did it.

[Docket No. 11-7, Exhibit 6, Investigation Meeting Notes].

Plaintiff testified, "I felt like I made a mistake, I'm owning up to my mistake." [Docket No. 11-2, p. 113].

With regard to the severity of his mistake, Plaintiff initially testified that as a consequence of his mistake, MPC could have lost money. *Id.*, pp. 112-113. However, Plaintiff then conceded that his mistake was very serious. *Id.* He admitted that his actions could have exposed himself and others to harmful and volatile chemicals, could have caused an environmental pollution incident, and could have caused a deadly explosion. *Id.*, p. 115.

**F.**

Following its investigation into the December 26, 2012 incident, MPC made the decision to terminate Plaintiff. With regard to MPC's reasons, Ms. McKnight of MPC's Human Resources department stated in her Affidavit that "the incident demonstrated a gross misunderstanding of the refining process for his state of training/employment and implicated serious safety concerns." [Docket No. 11-7, ¶6]. She further stated, "I can firmly attest that race was not a factor in MPC's decision to terminate [Plaintiff's] employment. *Id.*, ¶16.

Present for a termination meeting were three MPC employees, two of whom interviewed Plaintiff prior to him being hired, and Gerald Naliborski, the Operations Manager of the refinery. [Docket No. 11-2 pp. 119-120].

At the meeting, Plaintiff was told he was being terminated due to his performance issues and MPC's safety concerns related to the December 26, 2012 incident. *Id.*, p. 128.

According to Plaintiff, Mr. Naliborski stated either that Plaintiff did not look like an oil refinery operator or that Plaintiff did not look comfortable as a refinery operator; but Plaintiff is unsure as to which of these two statements was actually made. *Id.*, pp. 128.

Plaintiff further testified that Mr. Naliborski told him that "he didn't want me hurting co-workers nor myself because this industry is dangerous and that he'd rather discharge me rather than for him to have to tell my family or my co-workers' family that I've caused their or my own injury or death." *Id.*, p. 129.

Plaintiff's last day at MPC was January 3, 2013.

**G.**

Several months later, in April 2013, the Plaintiff filed a Complaint with the Equal Employment Opportunity Commission alleging that his discharge was due to his race. The

records does not contain any indication of the EEOC's conclusions. According to Plaintiff, he received his "Right to Sue" letter on January 6, 2014.

On December 29, 2017, Plaintiff filed his Complaint in Boyd Circuit Court alleging that his termination was due to his race in violation of KRS 344.040. Plaintiff alleges that he was terminated by MPC "solely due to his race" and that MPC "has retained white employees for similar offenses during their probationary period." [Docket No.1-1, Complaint, ¶¶ 9, 11, & 12]. The Defendant removed the case to the United States District Court on January 29, 2019. [Docket No. 1].

Defendant seeks summary judgment.

## II.

In order to sustain a motion for summary judgment, a Court it must find that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a). The moving party bears the initial burden of specifying the basis for its motion and of identifying that portion of the record which demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party satisfies this burden, the non-moving party thereafter must produce specific facts demonstrating a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Although the Court must review the evidence in the light most favorable to the non-moving party, the non-moving party is required to do more than simply show there is some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The rule requires the non-moving party to present specific facts showing that a genuine factual issue exists by "citing to particular

parts of materials in the record" or by "showing that the materials cited do not establish the absence ... of a genuine dispute [.]" Fed.R.Civ.P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505.

### III.

Plaintiff's sole allegation is that MPC terminated his employment "solely due to his race" in violation of the Kentucky Civil Rights Act, Ky. Rev. Stat. § 344.010, *et seq.* which prohibits discrimination based upon race. As the language of the KCRA mirrors, for the most part, that of Title VII of the Civil Rights Act, courts interpret the KCRA consistent with Title VII and, in this context, the burden-shifting framework set forth in *McDonnell Douglas*, 411 U.S. at 802–05, 93 S. Ct. at 1824–25. *Brewer*, 564 Fed. Appx. at 840; *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 283 (6th Cir. 2012)

Following the familiar *McDonnell Douglas* rubric, the initial burden is upon plaintiff to establish a *prima facie* case of discrimination. *Brewer*, 564 Fed. Appx. at 840; *Blizzard*, 698 F.3d at 283; *Chase*, 2015 WL 127995, at *6. To establish a prima facie case of race discrimination under a disparate treatment theory, plaintiff must show that: (1) he is a member of a protected class, (2) he was qualified for his job and performed it satisfactorily, (3) despite his qualifications and performance, he suffered and adverse employment action, and (4) he was replaced by a person outside the protected class or was treated less favorably than a similarly situated individual outside his protected class. *Shazor v. Prof'l Transit Mgmt., Ltd.*, 744 F.3d 948, 957 (6th Cir. 2014). *See also, Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 703 (6th Cir. 2007). In order to qualify as "similarly situated," an individual "must have dealt with the same supervisor, have been subject

to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them." *Hollins v. Alt. Co.*, 188 F.3d 652, 659 (6th Cir. 1999) (internal citations omitted); *see also Adebisi v. Univ. of Tenn.*, 341 Fed. Appx. 111, 112 (6th Cir. 2009).

If plaintiff establishes a *prima facie* case of discrimination, the burden then shifts to the defendant to "articulate some legitimate, nondiscriminatory reason for its actions." *Arendale v. City of Memphis*, 519 F.3d 587, 603 (6th Cir. 2008) (internal citation omitted); *see also Clay*, 501 F.3d at 703. If defendant provides a legitimate reason for the termination, the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the reasons offered by defendant were a pretext for discrimination. *Arendale*, 519 F.3d at 603. Pretext may be shown if "the proffered reason (1) has no basis in fact, (2) did not actually motivate defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000); *see also Wheat v. Fifth Third Bank*, 785 F.3d 230, 240 (6th Cir. 2015);

"[T]o survive summary judgment a plaintiff need only produce enough evidence to support a prima facie case and to rebut, but not to disprove, the defendant's proffered rationale." *Griffin v. Finkbeiner*, 689 F.3d 584, 592 (6th Cir. 2012) (internal citation omitted).

## IV.

In its motion, MPC states that, for the purposes of the motion only, it does not dispute that Plaintiff has met the first three prongs of a *prima facie* discrimination. Therefore, the court will begin its analysis at the fourth prong, where Plaintiff bears the burden to proving that he was treated less favorably than a similarly situated employee.

In *Mitchell v. Toledo Hosp.,* 964 F.2d 577 (6th Cir.1992), the Sixth Circuit noted three factors relevant to determining whether employees are "similarly situated" in the context of cases alleging differential disciplinary action:

> to be deemed "similarly-situated", the individuals with whom the plaintiff seeks to compare his/her treatment must have [1] dealt with the same supervisor, [2] have been subject to the same standards and [3] have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.

*Id.* at 583; *see also Johnson v. Kroger Co.,* 319 F.3d 858, 867 (6th Cir.2003) ("the weight to be given to each [*Mitchell*] factor can vary depending upon the particular case"); *Ercegovich v. Goodyear Tire & Rubber Co.,* 154 F.3d 344, 352 (6th Cir.1998) (observing that the *Mitchell* factors "generally are all relevant considerations in cases alleging differential disciplinary action"). Further elaborating in *Ercegovich,* the Court explained that the *Mitchell* factors do not require a plaintiff to "demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered 'similarly-situated;' rather, ... the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in 'all of the *relevant* aspects.' " 154 F.3d at 352 (quoting *Pierce v. Commonwealth Life Ins. Co.,* 40 F.3d 796, 802 (6th Cir.1994)).

This inquiry into what is often referred to as the "comparator" plays a critical role in the ultimate question of discrimination *vel non*. The closer the comparator, the more difficult it will be for a defendant to carry its burden in the analysis.

In his Complaint, Plaintiff alleged that MPC "has retained white employees for similar offenses during their probationary period." [Docket No. 1-1, ¶ 11). During his deposition, Plaintiff identified seven MPC employees who he believed were treated more favorably than him. [Docket No. 11-2. Pp.135-137]. However, Plaintiff was unable to provide evidentiary

support for this supposed comparator evidence as he conceded that he had no first-hand knowledge of any incidents related to these individuals but had only heard about them from others. *Id.* Obviously, this is not credible comparator evidence.

In his response to Defendant's motion, Plaintiff focuses his argument on one alleged comparator, Nick Warnock. Plaintiff contends that Mr. Warnock was "similarly situated" to him because the held the same position at MPC, were subject to the same rules, accused of similar conduct but was not subject to the same disciplinary action. Plaintiff implies that Mr. Warnock retained his job at MPC based on **his** race. However, Plaintiff's laundry list of comparator factors is nothing more than conclusory because he does not include any citations to the record.

So, what does the record reveal about Mr. Warnock? While at work at MPC, he repositioned a drum of cleaner and the cleaner splashed in his face. [Docket No. 11-7, ¶12]. As a result of the accident, he received counseling by MPC, but was not fired. Like Plaintiff, he was within his probationary period when the accident occurred. Unlike Plaintiff, Mr. Warnock's mistake did not put the safety of his co-workers at risk and cause an evacuation. *Id.* Rather, Mr. Warnock's action only exposed himself to danger. Mr. Warnock is not a proper comparator.

Fundamental to the comparator analysis is that the Plaintiff and other employees are similarly situated in "all relevant aspects." *Ercegovich*, 154 F.3d at 355. To be similarly situated in the disciplinary context, the plaintiff and his proposed comparator must have engaged in acts of "comparable seriousness." Employees who engage in conduct of a qualitatively different nature or under materially different circumstances are not "similarly situated" as a matter of law. *Colvin v. Veteran's Admin. Med. Ctr.*, 390 F. App'x 454, 458–60 (6th Cir.2010) (holding alleged comparator not similarly situated to plaintiff even though they held same position as pharmacists, were hired same date, had same supervisor, and both had problems

filling prescriptions; plaintiff's errors were qualitatively different with potentially more serious consequences). *See also, Clayton v. Meijer, Inc.*, 281 F.3d 605, 610–12 (6th Cir.2002) (plaintiff could not establish prima facie case of race discrimination, even though three white employees holding same position committed same error, because plaintiff caused serious harm to co-worker and others did not).

Plaintiff cannot rely on dissimilar conduct by other employees to satisfy the "similarly situated" prong.

Although the Court believes plaintiff's race discrimination claim likely falters at this stage, because the *prima facie* burden is not meant to be an onerous one, the Court will proceed in the analysis as if a *prima facie* case of race discrimination has been established.

Once the plaintiff makes out a *prima facie* case, he then must adduce evidence from which a reasonable finder of fact could infer that MPC's reasons for terminating plaintiff's employment are a pretext for intentional race discrimination. *Reeves v. Sanderson Plumbing Prods., Inc.* 530 U.S. 133, 148 (2000).

Defendant's stated reason for terminating plaintiff's employment are his admitted performance issues, specifically the facts and circumstances surrounding his dangerous and reckless actions on December 26, 2012. This is obviously a legitimate, nondiscriminatory justification. Indeed, Plaintiff concedes as much. He must therefore show that this stated reason had no basis in fact, did not actually motivate defendant's decision, or was insufficient to motivate the decision. *Id.*

Plaintiff does not, nor can he, argue that MPC's proffered reason was false. In fact, Plaintiff admits to every single fact about the incident on December 26, 2012. He admits that he was given specific instructions to lock out/tag out the sight glass. He admits that performing such

a task is a basic job function for a Utility Operator. He admits that when he returned to lock out/tag out the sight glass he was confused as to what he was supposed to do, but rather than seeking help, he pressed forward unsure of what he was actually doing. Plaintiff admits that he closed the steam drum, causing an NTE incident which caused the unit to be evacuated and could have caused a massive explosion.

At this stage of the analysis, Plaintiff's only remaining arrow in his rapidly diminishing quiver is to establish that his conduct, no matter how reckless and danger, did not actually motivate MPC to terminate his position. In an attempt to cast MPC's decision as fueled by racial animus, Plaintiff points to the statement made by Mr. Naliborski during the termination meeting, to-wit, that Plaintiff "did not look like an oil man." Yet, Plaintiff testified that he wasn't sure if this statement was even made. Plaintiff testified that during his termination meeting, Gerald Naliborski, Operations Manager, stated either that Plaintiff did not look like an oil refinery operator or that Plaintiff did not look comfortable as a refinery operator.

Whether Mr. Naliborski allegedly told Plaintiff that he didn't look like an oil refinery operator or that Plaintiff didn't look comfortable as an oil refinery operator is of no moment, because neither alleged statement shows any racial animus whatsoever. *Hall v. AK Steel Corp.*, Case No. 15-31-HRW, 2017 WL 4415655, *5 (E.D. Ky. Sept. 29, 2017) (granting summary judgment in a race discrimination case, finding that use of the term "boy" by a white employee to the African American plaintiff did not reflect any racial animus).

To the contrary, the record establishers that these statements refer to Plaintiff's continued performance issues and his incredibly dangerous actions surrounding the December 26, 2012 incident. Notably, Plaintiff testified that although he was not sure what Mr. Naliborski said, he clearly recalled Mr. Naliborski telling him that that "he didn't want me hurting co-workers nor

myself because this industry is dangerous and that he'd rather discharge me rather than for him to have to tell my family or my co-workers' family that I've caused their or my own injury or death." [Docket No. 11-2, p. 129].

Plaintiff has failed to establish a *prima facie* case of discrimination and, further, failed to a genuine issue of material fact with respect to whether Defendants' legitimate, nondiscriminatory reasons for terminating him are pretext for discrimination. Therefore, Defendant is entitled to summary judgment.

V.

Accordingly, **IT IS HEREBY ORDERED** Defendant Marathon Petroleum Company, LP's Motion for Summary Judgment [Docket No. 11] be **SUSTAINED**.

June 17, 2019.



Signed By:
*Henry R. Wilhoit, Jr.*
United States District Judge